429 S.E.2d 492

STATE of West Virginia ex rel. Gail TREADWAY, now Charlotte Richmond, Child Protective Service Worker, West Virginia Department of Health & Human Resources, Petitioner Below, Appellee,

v.

Richard McCOY, Father; Willard McCoy, Infant; and Angela Pearl Meadows, Infant, Respondents Below, Appellees,

Angela Pearl Meadows, Infant, Respondent Below; and Cletus Browning and Janet Browning, His Wife, Foster Parents, Appellants.

No. 21460.

Supreme Court of Appeals of West Virginia.

Submitted March 9, 1993.

Decided April 8, 1993.

Darrell V. McGraw, Jr., Atty. Gen., Thomas M. Woodward, Deputy Atty. Gen., Charleston, for appellee.

G. Ernest Skaggs, Fayetteville, guardian ad litem, for McCoy.

D. Clinton Gallaher, IV, Fayetteville, guardian ad litem, for Meadows.

Lynn B. Pollard, Oak Hill, for appellants.

NEELY, Justice:

 This is a custody dispute between foster parents, Cletus and Janet Browning, appellants,[1] who have looked after Angela Pearl Meadows since she was ten months old (and now want to adopt her) and little Angela's half-sister (who also wants to adopt Angela). The half-sister, Rita McCoy Stetson, has had virtually no contact with Angela since Angela's birth. The Brownings have cared for Angela since May, 1990, when Angela was less than a year old. The Circuit Court of Fayette County held that custody should be transferred to Ms. Stetson and her husband. However, the circuit court based his decision on the "rights" of the sister, not on the best interests of Angela. Our "polar star" in determining the custody of a child where there is no *biological parent* involved is the welfare and best interests of the child. We find that it is in the best interests of Angela to remain with her foster parents, the Brownings.

Angela was born on 20 June 1989. Her father, Richard McCoy, had a long history of sexually abusing his female relatives. Angela's mother, Stella Steele, was Richard McCoy's niece and a victim of incest at Mr. McCoy's hands. Angela was conceived from that union. Stella Steele and Mary McCoy, one of Mr. McCoy's daughters, brought incest charges against Mr. McCoy through the Fayette County Sheriff's Department. Mr. McCoy, upon discovering that Ms. Steele had filed incest charges against him, murdered Stella Steele on 13 April 1990. On 18 April 1990, Angela was removed from the McCoy home and taken into custody by the Department of Health and Human Resources (DHHR). Mr. McCoy is currently serving a life sentence for the murder of Angela's mother.

Ms. Stetson and her husband, appellees, were awarded custody of Angela by the Circuit Court. Ms. Stetson was born in 1963. Mr. McCoy, Angela's father, is also Ms. Stetson's father. When Ms. Stetson was seven years old, Mr. McCoy began sexually abusing her. Ms. Stetson ran away from home when she was twelve years old. She has not lived with her family since that time, and she has had virtually no contact with Angela. Ms. Stetson, as a result of the abuse by Mr. McCoy, cannot bear children. By all accounts Ms. Stetson is stable and has a loving relationship with her husband. The Rhode Island Department of Children and their Families conducted two home studies of the Stetsons and concluded both times that they would be fit parents.

On 30 April 1990, the circuit court held a custody review hearing. At this hearing, Rita McCoy Stetson came forward and asked to adopt Angela.[2] However, Gail Treadway, the DHHR caseworker assigned to Angela told the court that she would need to have a home study performed by Rhode Island before she would agree to the adoption by Ms. Stetson.[3] Furthermore, the circuit court noted that paternity of the child had not yet been established (there were two possible fathers, one of whom wanted custody). The court granted temporary custody of Angela to DHHR for six months. Inexplicably, no six month review hearing was held.

---

1. Angela's guardian *ad litem*, D. Clinton Gallaher, IV, is also an appellant in this case supporting the right of the Brownings to adopt Angela as being in Angela's best interests.

2. At the time of this hearing, paternity of Angela was not yet established. Boyd Steele, Jr. (Stella's widower), who had previously denied paternity, now claimed he was the father and requested custody. Blood tests later established that Mr. Steele was not the father.

3. On 30 June 1990, over two months after Ms. Treadway stated that Rhode Island needed to perform a home study, DHHR finally requested that Rhode Island perform the study. On 28 September 1990, Rhode Island sent its report to DHHR. DHHR does not account for its delay in requesting the study.

The next hearing was held by the circuit court on 15 May 1991. The circuit court was presented with the home study report, and the determination that Mr. McCoy was, in fact, the father. The court then held that the matter was not ripe for consideration because the Rhode Island home study was over seven months old and Mr. McCoy had not been present nor had he had a guardian *ad litem* been appointed to represent him. The court then ordered DHHR to request a new home study and Mr. McCoy to be represented by a guardian *ad litem*. DHHR did not request an updated home study from Rhode Island until 9 October 1991, nearly five months after the court ordered DHHR to request the report. DHHR received the second Rhode Island home study in December, 1991.

The most recent custody hearing was held on 28 February 1992. Richard McCoy admitted paternity and voluntarily waived all parental rights to Angela.[4] The circuit court reviewed the updated home study of the Stetsons, and heard the DHHR recommendation that custody of Angela should be awarded to the Stetsons. However, Angela's guardian *ad litem* objected to that recommendation, saying that Angela would be better served by being adopted by the Brownings, her custodians since before she was a year old.

Ever since May 1990, just after the initial custody hearing, Angela has resided with the Brownings under a foster care agreement. Throughout all of this litigation and bureaucratic delay, Angela has lived with the Brownings as their daughter. Angela suffers from cystic fibrosis; in order to make sure that Mr. and Mrs. Browning could care for Angela properly, the Brownings completed special training courses in how to care for a child with cystic fibrosis. At the February 1992, hearing, the Brownings testified to the circuit court that they wished to adopt Angela. The circuit court found that the Brownings had developed strong emotional ties with Angela.

Despite that finding of strong emotional ties, however, the circuit court, in his opinion letter of 6 March 1992 held:

> It is regrettable, but true, that the State of West Virginia's administrative handling of this matter, insofar as Angela Pearl Meadows, infant, is concerned, certainly lacks the quality of work and attention one would and should expect in such a very delicate and important matter. Such poor work has, wrongly or rightly, caused the foster parents, Mr. and Mrs. Browning, to develop certain expectations about the outcome of this case, and certainly they have formed a loving attachment to the infant. Nevertheless, I am unaware of any law which vests contractual foster parents with any legal rights which would rise to the level of "parental rights".

We share the circuit court's shock and dismay at the conduct of DHHR in this matter. DHHR's bureaucratic bungling has created this regrettable situation. Had DHHR promptly requested the home study from Rhode Island and then promptly requested a hearing before the circuit court within six months of the initial custody placement (as it should have) then the circuit court would have been able properly to award custody of Angela to the Stetsons in the fall of 1990. Instead, the bureaucracy crept along at an incompetent pace and the child who was supposed to be in temporary custody wound up staying with the foster parents for nearly three years.

■ This is a travesty that all of us involved in the child welfare system (courts, lawyers, and executive agencies) must not allow to be repeated. Article III, § 17 of the West Virginia *Constitution* provides that "justice shall be administered without sale, denial or delay." This provision imposes an affirmative duty on the DHHR and the courts to ensure that child custody matters are resolved as quickly as possible. *W. Va. Dept. of Human Serv. v.*

---

4. The circuit court terminated Mr. McCoy's parental rights at the 28 February 1992 hearing. *See* Transcript at 47–48. In the court's order of 1 April 1992, the court found "[t]hat Richard McCoy is the biological father of Angela Pearl

Meadows, and that he has been fully advised of all of his parental rights, and furthermore, that he has relinquished all of his parental rights in regard to Angela Pearl Meadows." Order, 1 April 1992.

*La Rea Ann C.L.*, 175 W.Va. 330, 337 n. 8, 332 S.E.2d 632, 638, n. 8 (1985). Finger pointing does no good, for the harm caused is irreparable. No matter who is responsible for the delay in this case, all of the parties involved are innocent and unwitting victims, caught up in the cogs of bureaucratic machinery.

Although we sympathize with the circuit court's desire to put the adult parties in the same position they would have enjoyed had the bureaucratic errors not occurred, we find that the circuit court erred by awarding custody to the Stetsons. Both statutory law and case law lead to the conclusion that custody should have been awarded to the Brownings.

■ "The controlling principle in every such case [where no biological parent is involved] is the welfare of the child and this Court has repeatedly said that in a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 405, 168 S.E.2d 798, 799 (1969) (quoted approvingly in *Honaker v. Burnside*, 182 W.Va. 448, 450–451, 388 S.E.2d 322, 324 (1989)). This discretion is limited by the right of a natural parent to raise his or her own child. *See Honaker v. Burnside*, 182 W.Va. 448, 451, 388 S.E.2d 322, 324–325 (1989). Although the circuit court discussed "parental rights" in his opinion letter, such rights are not at issue in this case.[5] The question is not who, the Stetsons or the Brownings, has "better" rights to custody of Angela, but with which custodian are Angela's best interests served.

The Legislature has expressly encouraged foster parents who develop emotional ties to the children for whom they care to adopt those children. *W.Va.Code* 49-2-17 [1978]. This section subsidizes adoptions by such foster parents:

Whenever significant emotional ties have been established between a child and his foster parents, and the foster parents seek to adopt the child, the child shall be certified as eligible for subsidy conditioned upon his adoption under applicable adoption procedures by the parents.

The goal is to encourage foster parents not to treat the children placed in their care as an income producing commodity, but rather to love their foster children as their own. The Legislature wants foster parents to know that if they become attached to a child in their care, the bureaucrats will not come and take the child away. Presumptively, if a child is in a loving and caring foster home, the child will be harmed by being removed from that home and placed in a strange, unknown home. The state, therefore, has implemented a policy encouraging foster parents to adopt their foster children.

■ In our case law, we have also developed a policy that stable relationships should be preserved whenever feasible. We have held that the best interests of the child often include being kept with his or her siblings. *James M. v. Maynard*, 185 W.Va. 648, 658, 408 S.E.2d 400, 410 (1991). However, this is not a rule to be applied by rote:

The increased professional emphasis in social work on the sibling relationship is consistent with the broadening focus of the literature about separation. [Citation omitted] The growing legal emphasis on the best interests of the child as the primary criterion for child placement decisions facilitates efforts *to preserve stable relationships for children.* [Emphasis added]

*James M.*, 185 W.Va. at 658, 408 S.E.2d at 410. If a child has a close bond to a sibling, then an appropriate factor in considering the custody of the child is to keep the siblings together. Ms. Stetson, although a half-sister, has had virtually no contact with Angela at any time in Angela's life. The only stable relationship in Angela's life is with the Brownings.

In *W. Va. Dept. of Human Serv. v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d

---

**5.** Consideration of parental rights is irrelevant in this case, as Angela's only living parent is Mr. McCoy, who has voluntarily relinquished his parental rights. Therefore, the only consideration in this case is the best interests of Angela.

632 (1985), we acknowledged that sometimes these strong emotional bonds may rise to the level of overwhelming the rights of a natural parent:

> [W]here the child has spent a substantial period of time in the home of foster parents, pending a ruling by the trial court on whether to approve a minor parent's relinquishment of child custody, extraordinary circumstances exist which demand that the best interests of the child not only be considered but be given primary importance. In such a case the minor parent's right to revoke his or her relinquishment ceases to be absolute, due to the passage of the unreasonable period of time.

*La Rea Ann C.L.*, 175 W.Va. at 335, 332 S.E.2d at 636. *Accord, In re Baby Boy Reyna,* 55 Cal.App.3d 288, 302, 126 Cal. Rptr. 138, 147 (1976) (The best interests of the child are not served by "uproot[ing] the child from the care and love of the nonparents with whom it has been living for a substantial period of time and plac[ing] it with the father with whom it has never had contact."); *Honaker,* 182 W.Va. at 452, 388 S.E.2d at 326 ("Elizabeth has been through a most traumatic ordeal by losing her mother at such a tender age. Taking away continued contact with the two other most important figures in her life would be detrimental to her stability and well-being.").

Although we sympathize with the plight of the Stetsons, we must look to the best interests of Angela today, not as her best interests might have been when the Stetsons first requested custody.[6] The best interests of a child are served by preserving important relationships in that child's life. Often, but not always, those relationships are with family members, such as a parent, a sibling or an aunt. However, in this case the most meaningful, stable relationship that Angela has is with the Brownings. Accordingly, Angela's best interests will be served by preserving that relationship and allowing the Brownings to adopt Angela.

For the foregoing reasons, the decision of the Circuit Court of Fayette County is reversed, and the case remanded for further proceedings consistent with this opinion.

Reversed and Remanded.

---

6. In *La Rea Ann C.L., supra,* we described a Pennsylvania court ruling that despite attachments developed subsequent to the bringing of the action, the Court felt compelled to decide the case as if it were the first hearing. We then rejected that position, holding, "we, on the other hand, believe that the appropriate procedure is to [decide the case] on the existing state of facts, rather than mak[e] a decision on a 'stale' record." *La Rea Ann C.L.,* 175 W.Va. at 335, 332 S.E.2d at 636.