679 S.E.2d 310

STATE of West Virginia ex rel. Kathryn KUTIL and Cheryl Hess, Petitioners

v.

Honorable Paul M. BLAKE, Jr., Judge of the Circuit Court of Fayette County, and the West Virginia Department of Health and Human Resources, Respondents.

No. 34618.

Supreme Court of Appeals of West Virginia.

Submitted March 11, 2009.

Decided June 5, 2009.

Anthony Ciliberti, Jr., Ciliberti Law Office, PLLC, Fayetteville, for Petitioner.

Ancil G. Ramey, Hannah B. Curry, Steptoe & Johnson, Charleston, for the Respondent, Paul M. Blake, Jr., Judge.

Darrell V. McGraw, Jr., Attorney General, Charleston, Angela Alexander Ash, Office of the Attorney General, Princeton, Thomas J. Steele, Jr., Fayette County Prosecuting Attorney's Office, Fayetteville, for the Respondent, West Virginia Department of Health and Human Resources.

Thomas K. Fast, Fast Law Office, Fayetteville, for Guardian Ad Litem.

Robert M. Bastress, Jr., Law Office of Robert M. Bastress, Jr., Allan N. Karlin, Jane E. Peak, Allan N. Karlin & Associates, Morgantown, Maura Monaghan (Admitted Pro Hoc Vice), Eliza M. Sporn (Admitted Pro Hoc Vice), Alison J. Page (Admitted Pro Hoc Vice), Andrea Glen (Admitted Pro Hoc Vice), Debevoise & Plimpton, New York, NY, for Amicus Curiae, National Association of Social Workers, National Association of Social Workers—West Virginia Chapter, The Evan B. Donaldson Adoption Institute, North American Council on Adoptable Children, West Virginia Coalition Against Domestic Violence.

Sharon M. McGowan (Admitted Pro Hoc Vice), ACLU Foundation, Washington, D.C., Terri S. Bauer, ACLU of West Virginia Foundation, Charleston, for Amicus Curiae, ACLU, ACLU of West Virginia, People for American Way Foundation.

James A. Campbell (Admitted Pro Hoc Vice), Alliance Defense Fund, Scottsdale, Arizona, Jeremiah G. Dys, Family Council of West Virginia, Charleston, for Amicus Curiae, Family Policy Council of West Virginia.

Stephen G. Skinner, Laura C. Davis, Skinner Law Firm, Charles Town, Gregory N. Nevins (Admitted Pro Hoc Vice), Lambda Legal Defense and Education Fund, Inc., Atlanta, GA, for Amicus Curiae, Foster Care Alumni Association, CASA of the Eastern Panhandle, Inc., COLAGE, Fairness West Virginia.

Richard E. Holtzapfel, Holtzapfel Law Offices, PLLC, Hurricane, for Amicus Curiae, The American College of Pediatricians.

PER CURIAM:

By means of this original jurisdiction action, Kathryn Kutil and Cheryl Hess (hereinafter collectively referred to as "Petitioners") seek a writ of prohibition to bar enforcement of the November 21, 2008, order[1] of the Circuit Court of Fayette County. Petitioners specifically are seeking to prevent the female infant, Baby Girl C. (hereinafter "B.G.C."),[2] from being removed from their foster home. B.G.C. was placed in Petitioners' home as a foster child by the West Virginia Department of Health and Human Resources (hereinafter "DHHR")[3] shortly after the child's birth. Petitioners are a same sex couple whose home had been approved by DHHR for both foster care and adoption. The removal of the infant was ordered at the conclusion of an abuse and neglect permanency hearing at which the lower court accepted the recommendation that B.G.C.'s case be transferred to the adoption unit of DHHR. In its removal order, the lower court directed that B.G.C. be moved from her temporary foster home and placed in a household interested in adoption that is a "traditional family" having a mother and a father rather than a household headed by a same sex couple or single person. In consideration of the arguments of the parties,[4] copies of court documents supplied with the briefs as exhibits and applicable legal authorities, we grant the relief requested.

## I. Factual and Procedural Background[5]

When B.G.C. was born on December 8, 2007, she tested positive for the presence of cocaine and oxycodone in her bloodstream. On this basis, while B.G.C. was still in the hospital DHHR instituted abuse and neglect proceedings against the biological mother,[6] and was granted custody of B.G.C. on December 13, 2007. At the same time, the

---

1. As related later in this opinion, the order was orally made at the conclusion of an evidentiary hearing held on November 21, 2008, and thereafter incorporated in a written order dated December 2, 2008.

2. Following our traditional practice in child abuse and neglect matters and other cases involving sensitive facts, we will not reveal the child's last name. See, e.g., In Interest of Tiffany Marie S., 196 W.Va. 223, 226 n. 1, 470 S.E.2d 177, 180 n. 1 (1996).

3. Both Judge Paul M. Blake (hereinafter "Respondent") and DHHR are named as respondents in the petition before us; however, prohibition does not lie against DHHR under the facts of this case because the agency was not acting in a judicial capacity. See W.Va.Code § 53–1–1 (1923) (Repl.Vol.2008); State ex rel. Miller v. Smith, 168 W.Va. 745, 756, 285 S.E.2d 500, 506 (1981) (performance of executive duties is not subject to a writ of prohibition).

4. We hereby acknowledge the contribution of the various amici curiae who filed briefs in this case. We have received three amicus briefs supporting Petitioners' position: one jointly authored by the American Civil Liberties Union, American Civil Liberties Union of West Virginia and People for the American Way Foundation; a second representing the collaborative efforts of Foster Care Alumni of America, COLAGE, CASA (Court Appointed Special Advocates) of the Eastern Panhandle, Inc. and Fairness West Virginia; and the third presented by the National Association of Social Workers, National Association of Social Workers–West Virginia Chapter, Evan B. Donaldson Adoption Institute, North American Council on Adoptable Children, and West Virginia Coalition Against Domestic Violence. Two amicus briefs were filed in support of Respondents' position: one by The American College of Pediatricians and the other by The Family Policy Council of West Virginia. We value the participation of these groups and the insights their briefs lend to the parties' arguments.

5. To aid the reader in understanding the numerous facts of this case, a timeline of significant occurrences is supplied as an appendix to this opinion.

6. The identity of the biological father is unknown.

court appointed a guardian ad litem (hereinafter "GAL") for B.G.C. Upon discharge of the infant from the hospital on December 24, 2007, DHHR placed B.G.C. directly into Petitioners' home, which had been approved previously by DHHR for both foster parenting and adoption and was then serving as a foster home for several other children.[7]

A motion to remove B.G.C. from the foster home was filed by the infant's GAL on January 24, 2008.[8] In support of his motion, the GAL maintained that removal was necessary even though the home appears "to be comfortable and physically safe for the infant respondent ... [he nonetheless believed] that the best interest of the child is not to be raised, short term or long term, in a homosexual environment and that the same is detrimental to the child's overall welfare and well-being." DHHR and the foster parents filed responses objecting to the motion. The motion was entertained at a January 31, 2008, hearing at which the lower court granted intervenor status to Petitioners. The February 25, 2008, order issued as a result of this hearing reflects that the court determined "not [to] interfere with the current foster care placement at this time" and reserved ruling on the removal motion as well as the GAL's request for full hearing on the motion.

The child's biological mother was granted two improvement periods, however, she failed in her efforts to become a fit parent. The biological mother's parental rights were terminated at a dispositional hearing held on October 8, 2008, which termination is memorialized in a November 5, 2008, order. Shortly following the termination, a multidisciplinary treatment team (hereinafter "MDT") met to discuss B.G.C.'s future. A "MDT/Status Report" dated October 28, 2008, containing the results of this meeting

was submitted to the court. The report reflected that the MDT endorsed the transfer of B.G.C.'s case to DHHR's regional adoption unit and recommended that B.G.C. remain in Petitioners' home during the adoption process. The MDT report also related that the team had been informed by the adoption unit supervisor that "there would be no reason for the Adoption Unit to move ... [B.G.C.] due to family members and siblings being previously ruled out [9] .... [and that] the Adoption Unit would be reluctant to 'uproot' a child from the only home she knows." The only member of the MDT who objected to the recommendation was the GAL. Following the release of the MDT report, DHHR issued a permanency plan on October 31, 2008, indicating the department's position that adoption was in the best interest of B.G.C.

The permanency plan also noted that Petitioners had expressed the desire to adopt B.G.C. followed by a list of reasons why the home would be appropriate for adoption.

A permanency hearing in the abuse and neglect case was held on November 6, 2008, at which the GAL renewed his motion for removal of B.G.C. from a "homosexual home." The lower court set forth its findings from the initial permanency hearing in a November 12, 2008 order. The order begins with a summary of the positions of the parties and then states the observations and findings of the lower court, including the following:

> 29. It also appears to the Court that the fairness showed by the Court by allowing the child to remain with the foster parents pending resolution of the case is now being used to support the argument that, since the child is developing bonds with the intervenors, the child should not be removed from the intervenors' care, and that adoption by the intervenors should be recom-

7. Ms. Kutil's adopted daughter, who had initially been placed by DHHR in the home as a foster child, was among the children present when B.G.C. was placed in the foster home. It is noteworthy that the adoption, which also occurred in Fayette County, was approved by the other judge in the circuit.

8. The motion also asked the court to enter a statewide injunction against DHHR to prohibit the agency "from placing foster children in ho-

mosexual homes," for which the lower court ultimately determined it lacked jurisdiction.

9. In response to an order of the lower court, DHHR had conducted home studies to determine if a custodial arrangement with a family member or sibling was feasible. These efforts resulted in finding that no such acceptable placement existed for B.G.C.

mended without purs[ue]ing adoptive parents which could provide a more traditional home setting.

\*    \*    \*    \*    \*    \*

31. The Court **FINDS** that children need both mother and father and that avenues to such a result should at the least be explored by the DHHR. The Court **FINDS** that untraditional family settings should not be the first and only route taken by the DHHR when searching for a permanent/adoptive placement for a child.

The November 12 order also includes the following conclusions of law:

4. The Court **CONCLUDES** that Circuit Courts are not required to accept the *Permanency Plan* of the DHHR and may either accept, reject or modify said recommendation depending on whether or not the Court finds it to be in the best interests of the child at issue.

5. The Court **CONCLUDES** that the polar star in all matters involving children is what is in the best interest of the child.

\*    \*    \*    \*    \*    \*

7. The Court **CONCLUDES** that the standards and guidelines in the Rules applicable for permanency placement review hearings are also applicable and should be considered during the initial permanency plan hearings. Pursuant to these standards and guidelines imposed upon the Courts, the Court must consider, among other things, the appropriateness of the current placement of the child and whether it is the most family-like setting. *See Rule 41(a)(6).*[10]

8. The Court **CONCLUDES** that, if at all possible, it is in the best interest of children to be raised by a traditionally defined family, that is, a family consisting of both a mother and a father. The Court **CONCLUDES** that non-traditional families, such as the intervenors, should only be considered as appropriate permanent/adoptive placements if the DHHR first makes a sufficient effort to place the child in a traditional home and those efforts fail. In other words, if the DHHR has attempted in good faith to secure a traditional family to adopt the child and the DHHR's attempts fail, then a non-traditional family may be considered as an adoptive placement. This did not occur in the present case.

9. For the above stated reasons, the Court **CONCLUDES** that it can only tentatively approve the *Permanency Plan* pending argument/hearing to address the issues raised in this hearing regarding the *Permanency Plan*, including the extent of the Court's authority over the execution of the *Permanency Plan* ... and argument/evidence in support of and in opposition to the guardian ad litem's pending motions.

10. Although not squarely before us, an argument raised in the amicus brief jointly submitted by the American Civil Liberties Union, the American Civil Liberties Union of West Virginia and the People for the American Way Foundation maintains that the lower court incorrectly relied upon the parenthetical reference to "most family-like" placement in Rule 41(a)(6) to arrive at the conclusion that a traditional home consisting of a mother and father is a preferred foster placement or adoptive home in this state. The first point argued in the brief is that the Abuse and Neglect Rules do not govern adoption proceedings and cannot be used to support the concept that the law favors adoption by married couples. It is then proposed that the provision in Rule 41(a)(6) of the Rules of Procedure for Abuse and Neglect Proceedings (hereinafter "Abuse and Neglect Rules") requiring consideration of whether a foster home placement of an abused and neglected child is "the least restrictive one (most family-like one) available," simply indicates a preference for a foster home over a group home or institutional setting. As further support for this position, reference is made to the following related Abuse and Neglect Rule provisions: Rule 41(a)(10)(E) ("If placement in a group home or institution is recommended [matters for discussion at a permanent placement review conference should include]: (i) An explanation of why treatment outside a family environment is necessary, including a brief summary of supporting expert diagnoses and recommendations; and (ii) A discussion of why a less restrictive, more family-like setting is not practical, including placement with specially trained foster parents[.]"); and Rule 28(c)(3) (The contents of a child's case plan when DHHR's recommendation is temporary or permanent placement outside of the child's home must include "[a] description of the recommended placement or type of home or institutional placement in which the child is to be placed ... and whether or not it is the least restrictive (most family-like) one available.)"

10. The Court **CONCLUDES** it is necessary and in the best interest of the child to **ORDER** that the DHHR place the child in a traditional home setting with a mother and a father. The Court deems such action necessary to materially promote the best interests of the child. In recognition of the bonds that may have formed between the child and the intervenors, and to lessen any stress on the child, the Court **CONCLUDES** that it is in the best interests of the infant child that the removal from the intervenors' home and placement in a traditional home should be completed over a two week transitional period. **The purpose of the removal and transfer to a traditional home is to materially promote the best interests of the child by encouraging and facilitating adoptive placement of the child with a traditionally defined family and to ease the child's transition when and if such adoptive placement occurs.**

(Emphasis in original.) The order also set November 21, 2008, as the date on which the evidentiary hearing regarding the permanency plan would be held.

On November 17, 2008, Petitioners petitioned this Court for a writ of prohibition accompanied by a motion for an emergency stay of the lower court's order of removal. The lower court rendered both matters moot by entering an order on November 18, 2008, staying its removal order.

DHHR had objected to the removal of B.G.C. from Petitioner's home until the day of the November 21, 2008, evidentiary hearing. Prior to the hearing convening that day, DHHR informed the lower court by fax that B.G.C. needed to be moved to another foster care home because Petitioners' home was over the capacity limit set for foster homes.[11] At the hearing it was made known that the last foster placement by DHHR in Petitioners' home had occurred on October 31, 2008, shortly before either of the permanency plan hearings.

The evidence presented at the November 21, 2008, hearing included the testimony of DHHR adoption and child protective service workers, both Petitioners and two expert witnesses—a clinical psychologist called by the GAL, and a clinical/forensic psychiatrist called by Petitioners.[12] At the conclusion of the hearing, the lower court renewed its previous finding that adoption was the proper permanency plan for B.G.C. and ordered from the bench that B.G.C. be removed from Petitioners' home by noon the following day for placement in the home of a married couple DHHR had identified as a potential adoptive home. The lower court later summarized the basis for its action in a December 2, 2008, order. This order included the following relevant findings of fact and conclusions of law:

13. The Court FINDS that the Kutil–Hess household may be the most appropriate adoptive placement home for the child, but it is unfair not to allow the child the option to be adopted by a traditional family. The child should be given the opportunity to be adopted by mother-father adoption and not be locked into a single parent adoption.

\* \* \* \* \* \*

15. The Court FINDS that the *Permanency Plan* of transition to the DHHR Adoption Unit is appropriate and should be accepted by this Court.

16. The Court FINDS that [B.G.C.] is presently in the intervenors' home, however, the DHHR has found the intervenors' home is over capacity and has asked the

---

**11.** There were a total of seven children in Petitioners' home on the day of the November 21 hearing, six foster children and Ms. Kutil's adopted daughter. The maximum number of children a foster home may house at one time is not entirely clear. West Virginia Code § 49–2B–2 (p) (2006) (Supp.2008) sets the capacity at "no more than five children who are unrelated by blood, marriage or adoption to any adult member of the household." However, there are inconsistencies in the state regulations regarding occupancy limits of foster care homes. *See* 78 C.S.R. 2–3.18 (providing that a foster family home may care for five or less children), *contra* 78 W.Va.C.S.R. § 2–13.3.a. (providing that the number of children who may reside in a foster home "may not exceed six (6).").

**12.** According to their testimony, neither of the experts actually assessed B.G.C.'s foster home relationships or environment.

Court to remove the child with a transitional period, based upon that reason. Thus, the Court FINDS that [B.G.C.] should be moved immediately. The Court FINDS that placement of [B.G.C.] in a home with a married mother and father pending such adoption process is most appropriate for the child's well being.

## CONCLUSIONS OF LAW

1. The Court CONCLUDES that the intervenors can not adopt this child as a couple because of statute. The intervenors argue that *they* are the only proper parties to be considered for the adoption of [B.G.C.]; however, under West Virginia law § 48–22–201, only married couples, married persons with consent of their spouse, or single persons may petition to adopt a child. For this reason, the Court CONCLUDES that the intervenors cannot lawfully petition *together* to adopt B.G.C., *only one* of the two intervenors may petition for adoption.

2. The Court CONCLUDES that the DHHR's request for removal based upon the fact that the intervenors' home is over-capacity should be GRANTED as it is in the child's best interest. Further considering the well-being of the child, the Court CONCLUDES and ORDERS that the child be removed from the intervenors' home by 12:00 noon November 22, 2008.

(Emphasis in original).

Before the written order was issued, Petitioners acted on the pronouncement of the lower court at the November 21 hearing by again seeking an emergency stay by this Court of the removal order. We granted the stay requested on November 26, 2008.[13] Thereafter, on December 9, 2008, this Court granted Petitioners leave to amend their previously filed petition for a writ of prohibition which is now under consideration.

---

**13.** Although Petitioners took steps to stop the enforcement of the removal order, it is undisputed that Petitioners complied with the terms of the order and delivered B.G.C. with her belongings to her new foster home on November 22. As related to this Court, on or about November 26, 2008, the prospective adoptive parents

## II. Standard of Review

■ The original jurisdiction authority of this Court to consider matters of prohibition stems from Article VIII, § 3 of the West Virginia Constitution. That authority is further recognized and defined by statute and rule. *See* W.Va.Code §§ 51–1–3 (1923); 53–1–2 (1933); W.Va. R.App. P. 14. Historically, we have been guarded about granting relief in prohibition, reserving its use for extraordinary situations. As we stated in the syllabus of *State ex rel. Vineyard v. O'Brien*, 100 W.Va. 163, 130 S.E. 111 (1925), "[t]he writ of prohibition will issue only in clear cases where the inferior tribunal is proceeding without, or in excess of, jurisdiction."

■ Petitioners do not allege that the lower court acted without jurisdiction of the subject matter and parties in the abuse and neglect action, but instead maintain that the lower court went beyond the bounds of its authority in ordering removal in this case. In such circumstances, we consider those measures outlined in syllabus point four of *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996), which reads as follows:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impres-

---

named in the removal order informed DHHR that conditions had changed and they were no longer in a position to adopt B.G.C.. The child was returned to Petitioners' home later this same day after this Court granted Petitioners' motion for the emergency stay of the removal order.

sion. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

With this standard in mind, we proceed to consider whether it was proper for the lower court to order removal of the infant from Petitioners' home.

## III. Discussion

Petitioners assert that the lower court was exceeding its legitimate authority by ordering the removal of B.G.C. from their home for placement in a traditional home which the court defined as headed by a mother and a father. Respondent asserts that removal was legally required under the circumstances before it because: (1) Petitioners as a couple are not permitted to adopt a child under the provisions of the adoption statute, and (2) the number of children residing in Petitioners' foster home exceeded the statutory limit. It is upon these legal foundations that Respondent maintains that it was necessary to order removal of the child from the home. Respondent further contends it also was appropriate to order placement of B.G.C. with a suitable married couple interested in adoption given the legislative preference expressed in the adoption statutes for adoption by married couples.

### A. Removal

As to Respondent's first ground for removal, it is not at all clear that the issue of joint adoption by unmarried parties was before the court. It is important to keep in mind that the purpose of the permanency hearing in an abuse and neglect case is to determine what type of permanent placement would provide "the level of custody, care, commitment, nurturing and discipline that is

consistent with . . . [a] child's best interests." *State v. Michael M.*, 202 W.Va. 350, 358, 504 S.E.2d 177, 185 (1998). And although adoption is the preferred permanent placement for a child when parental rights are terminated,[14] it is but one permanent placement option which DHHR may recommend in its permanency plan.[15] It was made abundantly clear during the course of the hearings in the present case that the permanency plan is designed to recommend a general course of action regarding future placement of a child after parental rights have been terminated, and that it would be premature for DHHR to recommend a particular adoptive home at the permanency hearing. Certainly, DHHR has the responsibility to develop a permanent placement plan for a child contemporaneously with reunification efforts,[16] but the details of the plan necessarily depend on the course of action the court determines to be most suitable under the circumstances. According to the testimony of DHHR workers, a particularized plan for a child whose recommended permanent placement is an adoptive home would not be completed until after the child's case is transferred to DHHR's adoption unit because the agency's operations involving adoptive home selection are run separately from DHHR's operations involving services for abuse and neglect victims. We further note that although Petitioners may have indicated the desire to make B.G.C. a permanent part of their household, there was no formal joint or individual request for adoption pending before the court at the permanency hearings.

This Court has clearly and consistently maintained that " '[c]ourts are not constituted for the purpose of making advisory decrees or resolving academic disputes.' *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont*, 126 W.Va. 183, 185–86, 27 S.E.2d 486, 487–88 (1943)." Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399

---

14. Syl. Pt. 2, *State v. Michael M., supra.*

15. *See* W.Va.Code § 49–6–5a (2007) (Supp. 2008); R. 41, W. Va. Rules of Procedure for Child Abuse and Neglect (identifying possible permanent living arrangements which may be recommended in abuse and neglect cases as re-

turning a child to parent(s), adoption, placement of a child with a fit and a willing relative, a legal guardian or in another planned permanent arrangement, including institutional settings).

16. Syl. Pt. 5, *In re Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173 (1999).

(1991). It was thus inappropriate for the lower court to rule as a matter of law on the subject of the propriety of joint adoption of a child by a same sex couple because it was not a matter pending before the court. Moreover, Petitioners have represented to this Court that joint adoption is not being sought, and Ms. Kutil has informed DHHR of her interest in adopting B.G.C. as a single person.

We next consider whether overcapacity suffices as a ground for removal of B.G.C. from her home. As was noted earlier, there were seven children residing in Petitioners' foster home during the time period when both permanency hearings occurred. Whether the upper limit for the number of children who may reside in a foster home is five or six,[17] Petitioners' foster home was overcapacity and the situation needed to be corrected.[18] Our concern lies with the manner in which the problem was rectified.

In its response to the pending writ of prohibition, DHHR stated that the change in the agency's position regarding removal of B.G.C. only occurred because of "overcrowding at Petitioners' home and the ready availability of a foster home that was willing and capable at the time to accept the infant, .... [and the agency] did not at that time have a placement available for the children who were most recently placed in the Petitioners' home." DHHR then added, "Nowhere has WVDHHR indicated that the home provided by Petitioners was anything other than loving and nurturing." Despite the number of times that this Court has stated the best interest of the child is the polar star upon which decisions involving children are to be based,[19] DHHR did not even consider whether the individual needs of B.G.C. would be best served by removing her from Petitioners' care, but instead opted for a swift and ready solution to the problem the agency created. The agency simply turned a blind eye to the fact that B.G.C. had been placed in the foster home a number of months before some of the other children then in the home, and ignored any consideration of the impact relocation would have on B.G.C.'s emotional, physical and mental development. By following the lead of DHHR, the lower court erred in not closely examining the individual needs of B.G.C. as well as of the other children placed in Petitioners' home to determine how the best interests of all the children would be served while remedying the overcapacity problem of the foster home.

No evidence was produced at the hearings as to Petitioners providing anything but quality care in their foster home, or of any particular problems B.G.C. was experiencing in her foster home environment. Consequently, the main concern in solving the overcrowding problem should have been what affect the disruption of relocation would have on the emotional and physical wellbeing of the individual children in the home. The length of time each of the foster children was in the home no doubt would affect the strength of the emotional bond that had developed between each child and Petitioners as well as their sense of comfort and security with their home environment. The only home B.G.C. had ever known in the eleven months of her life had been Petitioners' foster home. Surely bonding had occurred between the infant and Petitioners to a much larger extent than with children who had lived in the household for a much shorter period of time. We have been clear in pointing out that "[t]he best interests of a child are served by preserving important relationships in that child's life." Syl. pt. 2, *State ex rel. Treadway v. McCoy*, 189 W.Va. 210, 429 S.E.2d 492 (1993). This concern extends to the relationship a child in foster care has with foster parents. As we held in syllabus point eleven of *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996), "[a] child has a

---

17. *See supra* n. 7.

18. We find it disconcerting that DHHR just "discovered" the overcapacity issue on the date of the hearing when the agency had created the situation by placing what appears to have been more than one child in the home a month earlier. Even accepting DHHR's representation that the worker who handled the last placement in the home misunderstood relevant procedures, it is certainly not clear why it took a month for the agency to uncover this problem.

19. *See In re Erica C.*, 214 W.Va. 375, 380, 589 S.E.2d 517, 522 (2003) (numerous cases listed).

right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child." *Cf. In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005) (recognizing that a foster parent may attain the status of psychological parent when the relationship is not temporary in duration and exists with the consent and encouragement of a child's legal parent or guardian). The GAL contends that because B.G.C. is a child under the age of two she is less apt to have bonded with her foster parents. He relies on language we quoted from a Pennsylvania Superior Court in our decision in *West Virginia Department of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985) to support this proposition. This reliance is misplaced. The fundamental issue decided in *La Rea Ann C.L.* is that a minor parent's right to revoke the relinquishment of child custody ceases to be absolute when an unreasonable period of time has passed. *Id.* at Syl. Pt. 2, 332 S.E.2d 632. We further determined that in such circumstances "the best interests of the child not only be considered but be given primary importance." *Id.* The case was then remanded with instruction to the trial court "to receive evidence to make a finding of fact on the child's best interests presently." *Id.* at 337, 332 S.E.2d at 638. Thus, whether a given child has bonded with a parental figure is a question of fact.

■■■ The situation before us involves a removal decision where the foster home environment or care provided in a foster home is not in question, and removal of a child is necessary to correct problems created by bureaucratic error. When presented with such situations, courts need to safeguard the best interests of the children by examining evidence of the emotional, physical and mental needs of the individual children under the particular circumstances of a case, and then balancing the relative interests of the children in order to decide which child or children would be less traumatized or detrimentally affected by being removed from the home. No such examination or balancing occurred in the present case. However, even though the relevant analysis regarding the best interests of the children placed in Petitioners' home is a significant oversight, it is unnecessary for the lower court to further address that issue as we have been informed that the overcrowding problem has been resolved. During oral argument in this case, the Court was told that the foster home is no longer overcapacity, with only five children, including B.G.C., presently residing in Petitioners' home. Consequently, removal of B.G.C. to resolve an overcrowding problem is moot.

In consideration of the foregoing discussion of the grounds upon which Respondent ordered removal of B.G.C., such action constituted clear error and the writ of prohibition is granted on the removal issue.

## B. Adoption

Finding no merit in the grounds for removal asserted by Respondent, we must also consider Respondent's contention that removal of B.G.C. to a foster home representing a more traditional family unit consisting of a married mother and father who are interested in adoption furthers a legislative preference expressed in the adoption statutes.

■■■ West Virginia Code § 48–22–201 (2001) (Repl.Vol.2004) provides that

> [a]ny person not married or any person, with his or spouse's consent, or any husband and wife jointly, may petition a circuit court of the county wherein such person or persons reside for a decree of adoption of any minor child or person who may be adopted by the petitioner or petitioners.

The statute thus sets forth three classifications of persons who may adopt: (1) an unmarried person; (2) a married couple jointly; and (3) an individual in a marriage whose spouse consents. Although Respondent recognized that each Petitioner may individually petition to adopt under the statute, he asserts in his brief that the "statutes indicate a preference for adoption by married couples." No statutory citation was supplied to support this position and our research reveals no such stated preference. Nor were we able to

locate any legislatively assigned preference for adoption into a traditional home or any statutory definition of a traditional home for adoption purposes. As is evident from the clear language of West Virginia Code § 48–22–201, there is no prioritization among the three classifications of those eligible to adopt a child in this state. "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951).[20]

██ Notwithstanding Respondent's and GAL's suggestions to the contrary, there simply is no legislative differentiation between categories of eligible candidates for adoption under the terms of West Virginia Code § 48–22–201. Such policy determination is clearly a legislative prerogative, outside of the purview of the courts. The primary concern of courts in adoption cases is whether there is evidence that the recommended adoptive home possesses the necessary attributes to meet the individual and specific needs of the child both at present and in the future.[21]

C. Summary

██ Central to our deliberation in this case is the reason or motivation underlying Respondent's decision to remove a child from her foster care home. The motion to remove the child was not supported by any allegation that B.G.C. was receiving improper or unwise care and management in her foster home, or that she was being subjected to any other legally recognized undesirable condition or influence. W.Va.Code § 49–2–12 (1970) (Repl.Vol.2004); *see also* W.Va.Code § 49–2–14 (2002) (Repl.Vol.2004) (criteria and proce-

dure for removal of child from foster home). Likewise, no evidence supporting a legal reason for removing the child was presented at the hearings. As a matter of fact, the court was never presented with any actual evaluation of the home or evidence of the quality of the relationship B.G.C. had with Petitioners. Moreover, Respondent deferred hearing testimony from Petitioners' witnesses regarding their parenting abilities. Nevertheless, there also was no indication that Petitioners provided B.G.C. with anything other than a loving and nurturing home. As Respondent observed from the bench at the November 21 hearing, "there has been absolutely no allegation that these women have not cared for [B.G.C.] or the other kids and, in fact, all of the evidence indicates that they have done very well and have provided very well for the children." Without any information that the foster care placement with Petitioners was not proceeding well, there was no legal reason for the court to remove B.G.C. from the only home she has known.

██ It is more than apparent that the only reason why Petitioners were being replaced as foster care providers was to promote the adoption of B.G.C. by what Respondent called in his November 12, 2008, order a "traditionally defined family, that is, a family consisting of both a mother and a father." It was only by addressing issues he anticipated would develop and believed would be problems at a later point in this case that Respondent was even able to reach the subject of this conclusion. The conclusion itself thus represents a blurring of legal principles applicable to abuse and neglect and adoption. Moreover, even if our current statutes, rules and regulations could somehow be read to support the adoption preference proposed by Respondent, such a newfound principle would

---

**20.** The only express legislative preferences we have found with particular regard to adoption of children in the legal custody of the State involve grandparents and reunification of siblings. Specifically, West Virginia Code § 49–3–1(a)(3) establishes that a grandparent or grandparents found to be both suitable and willing to adopt a child in DHHR's custody be given priority over other prospective adoptive parents, and West Virginia Code § 49–2–14(e) & (f) expresses the preference that DHHR reunite siblings for either foster care or adoption purposes if such arrange-

ment is available and is determined to be in the best interests of the children. Neither of these preferences are automatic, however, as they turn on the best interests of the child who is the candidate for adoption.

**21.** Our discussion in this case does not extend to equal protection considerations because Petitioners did not raise that argument during the course of the proceedings below nor did they pursue it once raised in this prohibition proceeding.

need to be harmonized with established law. Under our current law which encourages adoption by qualified foster parents, one of the Petitioners seeking to adopt B.G.C. individually would at the very least need to be considered if not favored in the selection of the prospective adoptive home.[22]

In the present case, all indications thus far are that B.G.C. has formed a close emotional bond and nurturing relationship with her foster parents, which can not be trivialized or ignored. *State ex rel. Treadway v. McCoy; In re Jonathan G.* As such, it serves as a classic example of a case in which the permanency plan for adoption should move quickly to the desired result of a permanent home for B.G.C. One of the Petitioners who has already adopted a child [23] and appreciates the tremendous responsibility adoption entails, has recently expressed the desire to adopt B.G.C. Clearly, that Petitioner should not be excluded from consideration for the reason stated by Respondent. These factors all should serve to facilitate the selection process, which needs to be completed as expeditiously as possible in order to further the best interests of B.G.C. and in recognition and support of the parenting investment which has been made.

## IV. Conclusion

For the reasons stated in this opinion, the writ of prohibition sought by Petitioners is granted.

Writ of prohibition granted.

## APPENDIX

Timeline of Significant Occurrences

12-8-07   B.G.C. born testing positive for cocaine & oxycodone.

12-11-07   Abuse & neglect [A & N] petition filed.

12-13-07   DHHR granted legal custody of B.G.C.; GAL appointed for B.G.C.

12-24-07   B.G.C. placed in foster home of Petitioners after discharge from hospital.

1-24-08   GAL filed a "Motion to Order DHHR to Remove Child from Physical Placement in Homosexual Home & Other Injunctive Relief."

10-28-08   MDT meeting held and report issued finding adoption of the child as the acceptable disposition; report reflects DHHR Adoption Supervisor "informed MDT members that, although she must 'ensure that [B.G.C.] is doing well in her present placement", "there would be no reason for the Adoption Unit to move her due to family members and siblings being previously ruled out." The report goes on to say that the supervisor "further stated that the Adoption Unit would be reluctant to 'uproot' a child from the only home she knows."

10-31-08   Date on which DHHR placed seventh child in Petitioner's home [a foster home's maximum capacity is set at 5 or 6 foster children].

11-5-08   Order terminating parental rights of B.G.C.'s mother; the parental rights of both the mother and unknown father were terminated at a dispositional hearing held on October 8, 2008.

11-6-08   Permanency hearing in A & N case [DHHR recommends adoption].

11-12-08   First order of removal entered [directing that child be transitioned to a "traditional home" within two weeks].

11-17-08   Foster parents (Petitioners) file petition for writ of prohibition in Supreme Court.

**22.** *See State ex rel. Treadway v. McCoy,* 189 W.Va. at 213, 429 S.E.2d at 495; *cf. In re Jonathan G.,* 198 W.Va. at 735, 482 S.E.2d at 913.

**23.** *See supra* n. 6.

11–18–08 Circuit court order staying the November 12, 2008, order of removal.

11–21–08 Resumption of permanency hearing, including consideration of GAL motion to remove the child from the "homosexual home." At the conclusion of the hearing the lower court ordered DHHR to remove B.G.C. from Petitioners' home by noon the following day (November 22, 2008), and continue foster care placement of the child in the home of a prospective adoptive married couple identified during the hearing. [Petitioners complied with the order and B.G.C. was delivered with her belongings to the prospective adoptive home on November 22.]

11–24–08 Motion to Supreme Court for emergency stay.

11–26–08 Prospective adoptive married couple informed DHHR they would not adopt B.G.C. The child was returned to Petitioners' home later in the day after the motion for the emergency stay was granted by this Court.

12–2–08 Second order of removal memorializing hearing of November 21, 2008, entered. The order directed DHHR to move the child from Petitioners' home because Petitioners were not eligible to adopt the child together under the adoption statute and the number of foster children in Petitioners' home was over the capacity limit. Lower court iterated in this order that it was most appropriate to B.G.C.'s best interests to be placed in a traditional home with a married mother and father pending the adoption process.

12–9–08 Supreme Court Order granting petition.