No. 22-0365 – *In re: G.G.*

**FILED**
**June 21, 2023**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

BUNN, Justice, concurring:

I agree with the majority's determination that G.G.'s best interests require her continued placement with her foster parents. After having been placed with her foster family when she was just over one year old and having now resided in their care for approximately two years, disruption of this placement would likely wreak havoc on the young child's life given the significant attachments she has formed with her foster family. *See* Syl. pt. 2, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993) ("The best interests of a child are served by preserving important relationships in that child's life."). Therefore, I concur with the majority's opinion in this case.

I write separately to express my frustration with the protracted delays that have led to G.G.'s long-term placement with her foster family and contributed to the formation of the bond she now has with them to the exclusion of her right to form a relationship with her biological relatives. *See* W. Va. Code § 49-2-126(a)(5) (recognizing that "[f]oster children and children in a kinship placement are active and participating members of the child welfare system and have the following rights: . . . The right to be placed in a kinship placement, when such placement meets the objectives set forth in this article[.]"). All too often in abuse and neglect cases, bureaucratic delays in the identification of a child's relatives and consideration of the appropriateness of placing a

1

child in their care result in real life consequences for the children subject to such proceedings. This case is no exception.

The Legislature has established definite and fairly rigid time limits to govern the conduct of abuse and neglect cases,[1] and this Court also recognizes stringent timelines to guide the resolution of these proceedings.[2] These time limits help ensure that abuse and neglect cases are given priority and are resolved as expeditiously as possible for the young lives at stake in such proceedings. Our constant refrain for over three decades is that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. pt. 1, in part, *In Int. of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). Unfortunately, the continued search for a child's relatives, and

---

[1] *See, e.g.*, W. Va. Code § 49-4-111(b) (limiting termination of child's foster care arrangement "[w]hen a child has been placed in a foster care arrangement for a period in excess of eighteen consecutive months"); W. Va. Code § 49-4-602(a)(1) (restricting period of DHHR's temporary emergency care of child suspected to be abused or neglected to ten days); W. Va. Code § 49-4-604(e) (permitting court to grant parents "an improvement period not to exceed six months"); W. Va. Code § 49-4-605(a)(1) (requiring DHHR action when "a child has been in foster care for 15 of the most recent 22 months").

[2] *See, e.g.*, W. Va. R. P. Child Abuse & Neglect Proceed. 27 (directing court to enter adjudicatory order "within ten (10) days of the conclusion of the hearing"); *id.* at R. 32 (establishing timeframes for dispositional hearing); *id.* at R. 43 (requiring achievement of child's permanent placement "within twelve (12) months of the final disposition order, unless the court specifically finds on the record extraordinary reasons sufficient to justify the delay").

the exhaustive investigative process[3] employed to ensure the relatives are an appropriate placement for the child, very often causes the child to form deep and immutable attachments to the foster parents with whom she has been *temporarily* placed—so much so that once a relative is finally approved as a suitable caregiver, such relative placement would no longer serve the child's best interests. This case is an example of that very scenario.

Despite the efforts of G.G.'s relatives to serve as her caregivers during the underlying abuse and neglect proceeding, it appears that the DHHR[4] first told them that they had come forward too soon. Later, when the fictive kin placement failed and the DHHR sought a new placement for G.G., the relatives were not considered—until nearly three months later when they again initiated contact with the DHHR to seek her custody. While the relatives timely completed the appropriate paperwork to be considered as an out-

---

[3] For example, in this case G.G.'s relatives live in another state; therefore, the DHHR was required to coordinate with the corresponding agency in the relatives' home state to secure their home study and ensure that they would be a safe and appropriate placement for her. *See generally* W. Va. Code §§ 49-7-101 to -102 (detailing requirements for Interstate Compact on the Placement of Children).

[4] The Legislature recently reorganized the DHHR into three new departments: the West Virginia Department of Health, the West Virginia Department of Human Services, and the West Virginia Department of Health Facilities. *See generally* Acts of the W. Va. Legislature, Reg. Sess. 2023, H.B. 2006 (eff. May 23, 2023). While I refer to the agency involved in this case as the DHHR to maintain consistency with the underlying abuse and neglect proceeding and the majority's opinion in this case, I hope that the new department that will replace the existing DHHR takes heed of the concerns detailed herein.

of-state placement for G.G., unexplained delays and breakdowns in communication resulted in an additional five-month period before the relatives' home was finally approved as an appropriate placement. After these delays, the circuit court determined that young G.G. had formed such a deep bond with her foster family that moving her to another placement, albeit with her relatives, would be more detrimental to her well-being than beneficial.

I understand and appreciate the issues regarding staff retention, inadequate resources, and other institutional difficulties that may hamper the DHHR's ability to devote its full attention to any particular child entrusted to its care during the course of an abuse and neglect case. *See generally State ex rel. W. Va. Dep't of Health & Hum. Res. v. Bloom*, 247 W. Va. 433, 880 S.E.2d 899 (2022). However, where, as here, a child's biological relatives initiate contact with the DHHR during a previous abuse and neglect proceeding concerning the child's siblings and are effectively rebuffed because they have expressed interest in receiving placement of the children too early, it does not seem prohibitively difficult to retain the relatives' information so that they may be contacted should they be needed as caregivers in the future—particularly when the Legislature has enacted a series of statutes specifically addressing the DHHR's record keeping responsibilities concerning children who have been entrusted to its care or to whom it has provided services. *See* W. Va. Code §§ 49-5-101 to -106. In other words, insofar as the DHHR apparently keeps records of a child's siblings, even when the child and her siblings are born across different

4

years, it certainly seems possible to also include the child's known relatives in those records for ease of reference in any future abuse and neglect proceeding.

The extensive efforts of the DHHR in striving to protect the children of this State through the abuse and neglect process do not go unnoticed. *See* W. Va. Code §§ 49-2-802(a)-(b) (requiring DHHR to "establish or designate in every county a local child protective services office" and further directing "[t]he local child protective services office shall investigate *all* reports of child abuse or neglect" and "provide protective services to prevent further abuse or neglect of children and provide for or arrange for and coordinate and monitor the provision of those services necessary to ensure the safety of children," among other enumerated duties (emphasis added)). *See also* W. Va. Code § 49-1-105 (recognizing purposes of child welfare system generally and corresponding duties of state agencies to achieve those goals). However, the DHHR should also remain mindful of the need for timely and prompt action in such proceedings to ensure that children's rights are not inadvertently trammeled. As the majority astutely noted, "[r]egardless of who is responsible for the delay in this case, the child is the unfortunate victim." *W. Va. Dep't of Hum. Serv. v. La Rea Ann C.L.,* 175 W. Va. 330, 337 n.8, 332 S.E.2d 632, 638 n.8 (1985). This quote aptly describes the various quagmires in the DHHR's process that shaped the contours of G.G.'s abuse and neglect proceeding and contributed to her long-term placement with foster parents instead of enabling her to form a bond with, and be placed with, her biological relatives who desperately sought her care. I only hope that, in future abuse and neglect cases, the DHHR will remain vigilant in its continuing efforts to

5

safeguard the rights of the children it seeks to protect and that the courts presiding over those proceedings will remain steadfast in their efforts to ensure that such cases are resolved as expeditiously as possible. For these reasons, I respectfully concur with the majority's opinion in this case.