725 S.E.2d 182

**Jeffrey E. SKIDMORE, Petitioner Below, Appellant**

v.

**Crystal L. ROGERS, Respondent Below, Appellee.**

No. 35291.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 25, 2011.

Decided April 4, 2011.

Daniel R. Grindo, Esq., Gassaway, WV, for Appellant.

James Wilson Douglas, Esq., Sutton, WV, for Appellee.

WORKMAN, Chief Justice:

The appellant in this action, Jeffrey E. Skidmore ("Skidmore"), appeals two orders of the Circuit Court of Braxton County, West Virginia, affirming two decisions of the Family Court of Braxton County. Primarily, Skidmore appeals the lower court's decision to deny his request to increase the amount of parenting time he has with his son. The appellee, Crystal Skidmore, now Crystal Rogers ("Rogers"), objected to Skidmore's petition to modify the parenting plan order. The family court denied Skidmore's request finding that the relevant statute, West Virginia Code § 48–9–401 (2009), does not permit modification under the facts of this case. The circuit court affirmed that ruling. This Court, however, finds that the lower courts misinterpreted that statute and that Skidmore is entitled to increased parenting time with his son. The case, therefore, is reversed on that issue and remanded for modification of the parenting plan order. The Court, however, affirms the lower courts'

orders concerning Rogers's petition for an expedited modification of child support.

## I. FACTS AND PROCEDURAL HISTORY

During their seven years of marriage, Skidmore and Rogers had one child, Joshua, born on June 22, 1997. The parties filed for divorce in 1999 and a final divorce decree was entered on February 26, 2002. On the same date, a parenting plan order was entered dividing parenting and child support obligations between the parties. Joshua was approximately eighteen months old when the parties separated, and approximately four and a half years old when the parenting plan order was entered.

The parenting plan order designates Rogers as the custodial parent and establishes a somewhat confusing visitation schedule for Skidmore. Under the plan, Joshua spends two consecutive overnights with his father, two times one month and three times the next. The overnights are scheduled for Skidmore's two consecutive "days off duty" ("DODs"), because, as a police officer, Skidmore does not always have time off on weekends and his DODs are subject to change.[1] Thus, in practice, Joshua spends four nights with his father one month and six nights the following month. Because Skidmore lives less than ten miles from Rogers, the travel between their homes is minimal and does not impact Joshua's access to school.

The parenting plan order further provides that the parties share decision-making responsibility for Joshua, with the exception that Rogers is solely responsible for making decisions regarding non-emergency medical care, alternate child care and discipline. Pursuant to the plan, Rogers is responsible for providing Joshua with health insurance.

Following the divorce, Skidmore remarried. He and his new wife have two children together, one of whom was born after the petition was filed in this case. These children are Joshua's half-siblings. Rogers has also remarried, but has not had any more children.

On March 7, 2008, Skidmore filed a petition to modify the parenting plan order pursuant to West Virginia Code § 48–9–401, which allows for modifications based on substantial changes in circumstance that were not anticipated in the parenting plan order, or a showing that the plan is not working as contemplated and is manifestly harmful to the child. Skidmore argued that the parenting plan order in this case is not working as contemplated because unanticipated changes in circumstance occurred with the births of Joshua's half-siblings. Alternatively, he argued that, even if no change in circumstances has occurred, the plan must be revised to avoid harming Joshua. He asserted that Rogers is preventing Joshua, who was eleven years old when Skidmore filed the petition, from spending significant time with his father and half-siblings.

In his petition, Skidmore alleged that Rogers has prevented Joshua from seeing his father outside of the allotted parenting plan days, and does not allow Joshua to attend special events with Skidmore's family, such as his half-sister's birthday parties, unless the event falls on a pre-scheduled parenting day. He further contended that Rogers's continued animosity towards Skidmore, and her refusal to allow Joshua to spend more time with his dad, has negatively impacted Joshua's well-being. For these reasons, Skidmore requested that the family court revise the parenting plan order to appoint Skidmore as Joshua's primary custodian. He attached to his petition a supplemental financial statement indicating his then-current salary.

On March 31, 2008, Rogers filed a responsive pleading objecting to the petition for modification, arguing that Skidmore filed the petition to harass her and that his primary goal is to reduce his child support payments. In addition, based on the information contained in Skidmore's supplemental financial statement, Rogers requested that Skidmore be ordered to pay increased child support. She made this request in the last paragraph

---

1. During oral argument before this Court, Skidmore's counsel indicted that Skidmore has recently been promoted and, as a result, now works typical nine-to-five week-day hours and does not have to work on weekends.

of her response brief, rather than filing a separate petition to modify child support.

Thereafter, Skidmore filed a motion requesting that the family court take Joshua's testimony. The family court declined to hear from Joshua directly and instead appointed a guardian ad litem for Joshua, pursuant to West Virginia Code § 48–9–403. The guardian ad litem conducted interviews with Joshua and both of his parents. He then submitted a written report to the family court, finding that Joshua has a good relationship with both of his parents and both of his stepparents, and that he is particularly bonded to both his maternal grandmother and his half-sister. The guardian ad litem further found Joshua to be "bright, articulate and unusually personable" and "mature for his age." He noted that Joshua does well in school, although both Joshua and his parents acknowledge that he needs to be pushed to complete his homework. Joshua indicated to the guardian ad litem that he would prefer to spend "equal time or close to each parent."

In his recommendation to the Court, the guardian ad litem found that both parents provide adequate guidance to Joshua regarding his school and homework responsibilities. He concluded that Joshua's best interests would be served through additional parenting time with Skidmore, in light of Joshua's desire to spend more time with his father and half-sister. The guardian ad litem recommended that Rogers remain the primary custodial parent, but that the parenting plan be revised so that Joshua would split time between his parents during the school year, alternating between their homes each week.

On December 31, 2008, the family court conducted a hearing at which counsel for both parties examined the guardian ad litem. Then, on January 15, 2009, the family court conducted a telephonic hearing with the parties to advise them of its decision on Skidmore's petition. On the record at that hearing, the family court made extensive findings of fact, including finding that a bond exists between Joshua and his half-sister and that Joshua desires to spend more time with his father. The family court noted that although it may consider Joshua's preferences, those preferences are not binding because Joshua was not yet fourteen years old. *See* W. Va.Code § 48–9–402(b)(3) (2009).

Despite these findings, the family court denied Skidmore's petition and refused to modify the parenting plan order, concluding that he was prohibited from doing so by the terms of the statute. The family court found that no substantial change in circumstance had occurred, stating that "the birth of a sibling with whom the child has a significant bond, does not rise to the level of a change in circumstance." The family court further found that the current parenting plan order was not "manifestly harmful" to Joshua and, thus, no modification was warranted. It concluded that "manifest harm" can only be shown by evidence of "something close to abuse and neglect," and no such conditions are present in this case.

The family court then addressed Rogers's request to modify the child support order, which was included in the last paragraph of her response brief to Skidmore's petition. The family court noted that not only had she not filed a petition for modification of child support nor paid the accompanying filing fee, she had also failed to file a financial statement. Moreover, Rogers failed to allege in any pleading that she is entitled to a 15% or more change in support under the child support guideline, which West Virginia Code § 48–11–105(b) (2009) sets forth as the threshold for modifying an existing child support order. Accordingly, the family court concluded that Rogers's pleadings were insufficient on that matter and denied her request.

The next day, on January 16, 2009, Rogers filed a "Petition for Expedited Modification of Child Support" and paid the accompanying filing fee. In that petition, Rogers asserted that Skidmore's income had increased and that her expenses relating to Joshua's medical insurance had also increased. Specifically, she stated that "health care costs have increased to $290.28 per month and addition of dental coverage is $78.14 per month." She then requested that any modification of the child support order be made retroactive to March 31, 2008, when she first raised the issue in her response brief.

Because Rogers sought expedited modification of the child support order, the family court, pursuant to West Virginia Code § 48–11–106(b) (2009), notified Skidmore of its tentative recalculation of the amount of support owed. Based on the information provided in Rogers's petition, the family court determined that if the petition was granted, Skidmore's financial obligation would rise from $531.47 a month to $661.49 a month. Skidmore filed an objection to the petition.

On March 18, 2009, the family court conducted a hearing on Rogers's petition for expedited modification of child support. At that hearing, Skidmore acknowledged his increase in salary, but requested, for the first time, that he be permitted to carry Joshua on his health insurance. Skidmore argued that he could add Joshua to his family insurance plan without increasing the cost of the coverage. He argued that allowing him to add Joshua to his coverage would save Rogers approximately $350.00 a month in health insurance costs. In return, based on the family court's calculations, his child support would only increase to $584.29 per month, rather than to $661.49 per month. Because the increase in support from $531.47 to $584.29 would be less than fifteen percent, no change in support would be ordered pursuant to West Virginia Code § 48–11–105(b). Thus, Skidmore characterized the change as a "win-win," with Skidmore saving approximately $130.00 a month in child support while Rogers's monthly health insurance expenses would be reduced by approximately $350.00. Skidmore further asserted that his health insurance coverage is comparable to Rogers's, as Rogers is a federal employee and he is an employee of the State of West Virginia.

Rogers, who appeared pro se at the hearing on her petition, objected to allowing Skidmore to carry Joshua's health insurance because she did not want any reason to have to speak to Skidmore more often. In response, Skidmore's attorney represented that she would be given an insurance card to use for Joshua and would not have to speak to Skidmore when using it. The family court, however, determined that in light of the adversarial history of the parties dealings with each other, it was better to leave the health insurance obligation with Rogers.

The family court, therefore, ruled that Rogers would continue to carry Joshua on her health insurance and it increased Skidmore's child support obligation to $661.49 per month. The family court, however, refused to make such award retroactive to the date of Skidmore's original petition to modify the parenting plan, as Rogers had requested.

Meanwhile, on March 5, 2009, Skidmore appealed the denial of his motion to modify the parenting plan order to the circuit court. In an order entered on June 23, 2009, the circuit court affirmed the family court's decision, finding that no evidence indicated that the family court's factual findings were erroneous, or that the family law judge abused his discretion. Skidmore then similarly appealed the family court's ruling on Rogers's motion to modify child support. On July 2, 2009, the circuit court refused Skidmore's petition to appeal, finding that the family court had not abused its discretion by continuing to assign the health insurance responsibility to Rogers. It is from these two orders that Skidmore now appeals.

## II. STANDARD OF REVIEW

On appeal, Skidmore argues that the lower courts erred in their interpretation of West Virginia Code § 48–9–401 (2009), which governs modifications to parenting plan orders, and that it abused its discretion in refusing to allow Skidmore to insure Joshua under his health insurance plan. Rogers, in a cross-assignment of error, contends that the family court erred by denying her original request for an increase in child support, which was contained in her response to Skidmore's motion to modify the parenting plan. She therefore asks that the increase in child support later granted by the family court be made retroactive to March 7, 2008, the date of the original request.

This Court reviews the questions of statutory interpretation raised in this appeal *de novo*, while deferring to the family court's findings of fact and application of law to fact.

In reviewing a final order entered by a circuit court judge upon a review of, or

upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

## III. DISCUSSION

### A. Modification of the Parenting Plan

The provisions of West Virginia Code §§ 48–9–101 to –604 (2009 & Supp.2010) set forth guidelines for courts to follow in making custody decisions for children whose parents do not reside together. In making such determinations, it is the "public policy of this state to assure that the best interest of children is the court's primary concern. . . ." *Id.* at § 48–9–101(b). Consequently, the Legislature set forth several overarching goals for courts to follow in determining custody arrangements:

(a) The primary objective of this article is to serve the child's best interests, by facilitating:

(1) Stability of the child;

(2) Parental planning and agreement about the child's custodial arrangements and upbringing;

(3) Continuity of existing parent-child attachments;

(4) *Meaningful contact between a child and each parent;*

(5) Caretaking relationships by adults who love the child, know how to provide for the child's needs, and who place a high priority on doing so;

(6) Security from exposure to physical or emotional harm; and

(7) Expeditious, predictable decision-making and avoidance of prolonged uncertainty respecting arrangements for the child's care and control.

(b) *A secondary objective of article is to achieve fairness between the parents.*

*Id.* at § 48–9–102 (emphasis added).

In divorces, such as the instant case, a court must enter a permanent parenting plan order to govern the child's custody arrangement. Pursuant to West Virginia Code § 48–9–205, such plans must establish the child's living arrangements, designate each parent's custodial responsibility, create a visitation schedule for the other parent and allocate decision-making responsibility between the parents. *Id.* at § 48–9–205(c). Such parenting plan orders "may, at the court's discretion, contain provisions that address matters that are expected to arise in the event of a party's relocation, or provide for future modifications in the parenting plan if specified contingencies occur." *Id.* at § 48–9–205(d).

Once entered, a parenting plan order may only be modified under certain circumstances. W. Va.Code §§ 48–9–401, –402, –403 & –404. Specifically, section 401 provides for modification upon a showing of changed circumstances or harm to a child, section 402 provides for modification without a showing of changed circumstances, section 403 provides for modification upon the relocation of a parent, and section 404 provides for modification due to a parent's military service. *Id.*

In the instant case, Skidmore filed his petition to modify the parenting plan order pursuant to West Virginia Code § 48–9–401, entitled "Modification upon showing of changed circumstances or harm."[2] That section provides, in pertinent part:

---

**2.** Skidmore did not seek modification under West Virginia Code § 48–9–402, which provides for modification when no change in circumstance has occurred, as the conditions necessary for modification under this section are not met in this case. Specifically, this section applies to situations in which both parents agree to a modification, or (1) the modification is made to reflect "the de facto arrangements under which the child has been receiving care from the petitioner

. . .," (2) only a minor modification of the plan is requested, or (3) the modification "[i]s necessary to accommodate the reasonable and firm preferences of a child who has attained the age of fourteen." *Id.* at § 48–9–402(b). In this case, Rogers has not agreed to the modification, the request is not based on "de facto arrangements," Skidmore is requesting a significant modification to the plan and Joshua was not yet fourteen years of age when the petition was filed. *See id.*

(a) Except as provided in section 9–402 [§ 48–9–402] or 9–403 [§ 48–9–403], *a court shall modify a parenting plan order if it finds, on the basis of facts that were not known or have arisen since the entry of the prior order and were not anticipated therein, that a substantial change has occurred in the circumstances of the child or of one or both parents and a modification is necessary to serve the best interests of the child.*

(b) In exceptional circumstances, *a court may modify a parenting plan if it finds that the plan is not working as contemplated and in some specific way is manifestly harmful to the child,* even if a substantial change of circumstances has not occurred.

(c) Unless the parents have agreed otherwise, the following circumstances do not justify a significant modification of a parenting plan except where harm to the child is shown:

(1) Circumstances resulting in an involuntary loss of income, by loss of employment or otherwise, affecting the parent's economic status;

(2) A parent's remarriage or cohabitation; and

(3) Choice of reasonable caretaking arrangements for the child by a legal parent, including the child's placement in day care.

W. Va.Code § 48–9–401 (emphasis added). Thus, pursuant to this section, a party may seek a modification of a parenting plan based upon a substantial change in circumstance that was not anticipated in the original parenting plan order or because the parenting plan is not working as contemplated and is manifestly harmful to the child. *Id.* at § 48–9–401(a) & (b).

Skidmore argues that the two alternative grounds for modifying a parenting plan order under West Virginia Code § 48–9–401 are both met in this case. First, he contends that Joshua's age and his close relationship with his half-sister constitute "substantial changes in circumstance" that justify a modification of the parenting plan. He notes that the guardian ad litem testified that Joshua's best interest would be served by allowing him to spend additional time with his father and his half-sister.

Alternatively, Skidmore argues that, even if there has been no substantial change in circumstance, the parenting plan is not working as intended and is causing harm to Joshua. Skidmore contends that the current division of parenting time was appropriate when the plan was implemented, because Joshua was quite young. He argues, however, that because Joshua is now in middle school and at a very different stage of development, he is harmed by not being allowed to spend much time with his father. Skidmore further points out that Joshua is very bonded to his half-sister, and wants to spend more time with her. Finally, Skidmore notes that the guardian ad litem believes Joshua is being harmed by the current plan and warned the family court that Joshua may begin acting out in school or become withdrawn as a result of being denied time with his father and half-siblings.

Rogers, on the other hand, argues that neither Joshua's age nor his relationship to his half-sister constitutes a substantial change in circumstance that was not anticipated prior to the entry of the parenting plan order. Rogers argues that Joshua's advance in age was certainly anticipated when the parenting plan was entered, and that the birth of a sibling is not the type of change intended to be the basis of a modification under the statute. Rogers points out that a parent's decision to remarry is not a basis for modification and argues that the birth of a child is not unexpected when a parent remarries. *See* W. Va.Code § 48–9–401(c)(2) ("Unless the parents have agreed otherwise, the following circumstances do not justify a significant modification of a parenting plan except where harm to the child is shown: ... (2) A parent's remarriage or cohabitation; ..."). Thus, she argues that no substantial change in circumstance has occurred.

Rogers further contends that the current parenting plan is not operating in a manner that is "manifestly harmful" to Joshua. She points out that, although the guardian ad litem found that harm may result from the current plan, he did not testify that the plan

is "manifestly harmful." Accordingly, Rogers argues that the circumstances in this case do not rise to the level needed to modify the parenting plan order under this theory either.

The family court agreed with Rogers on both issues, finding that Joshua's age and the birth of his half-siblings do not constitute substantial changes in circumstance and, further, that the parenting plan order as it is currently operating is not "manifestly harmful" to Joshua. The circuit court affirmed this decision. This Court disagrees, however, and finds that the family court misinterpreted both sections of the statute.

### 1.

■ Rogers argues, and the lower courts agreed, that no change in circumstance has occurred under West Virginia Code § 48–9–401(a), because Joshua's advance in age and the birth of two half-siblings are the types of changes that could have been anticipated when the parenting plan order was entered. This interpretation, however, misconstrues the plain language of the statute. " 'Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' Syl. Pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968)." Syl. Pt. 1, *State v. Williams*, 196 W.Va. 639, 474 S.E.2d 569 (1996).

■ West Virginia Code § 48–9–401(a) provides, in relevant part:

a court shall modify a parenting plan order if it finds, *on the basis of facts that were not known or have arisen since the entry of the prior order and were not anticipated therein*, that a substantial change has occurred in the circumstances of the child or of one or both parents and a modification is necessary to serve the best interests of the child.

(Emphasis added). Contrary to the finding of the lower courts, the plain language of this statute does not prohibit modifications of a parenting plan order simply because the change in circumstance *could have been anticipated* when the order was entered. Rather, it permits modifications of a parenting plan order "on the basis of facts that . . . have arisen since the entry of the prior order and *were not anticipated therein*." *Id.* (emphasis added). The phrase "not anticipated therein" does not mean that the change in circumstance could not have been anticipated generally, but rather that the parenting plan order does not make provisions for such a change.

■ Thus, under the plain meaning of the statute, the relevant question is not whether a particular change in circumstance *could* have been anticipated, but whether the parenting plan actually did anticipate, and provide accommodation for, the particular change. Accordingly, this Court now holds that West Virginia Code § 48–9–401(a) (2009) permits a court to modify a parenting plan order on the basis of a substantial change in circumstance that arises after the parenting plan order is entered if such change was not provided for in the parenting plan and modification is necessary to serve the best interests of the child. Whether such a change in circumstance could have been anticipated when the original parenting plan order was entered is of no consequence.

■ In this case, two substantial changes in circumstance have occurred since entry of the parenting plan order, neither of which were provided for in that order. First, Joshua was only four-years-old when the parenting plan order was entered in this case, and the custody arrangement reflects that fact. While limiting Skidmore's parenting time with Joshua to four to six days a month may have been appropriate when Joshua was a young child, such arrangement no longer serves Joshua's best interest as an eleven-year-old boy. Accordingly, Joshua's significant advance in age, which was not provided for in the original parenting plan, is a substantial change of circumstance on which a modification of the parenting plan order may be based.

■ Similarly, since entry of the parenting plan order, Skidmore has remarried and Joshua now has two half-siblings. Again, the parenting plan makes no provision for such a change in circumstance. The guardian ad litem testified that allowing Joshua to spend more time with his half-siblings, with whom

he is bonded, is in Joshua's best interest. Indeed, the laws of this State recognize, in a variety of areas, the importance of sibling bonds and encouraging sibling contact. *See, e.g.,* Syl. Pt. 4, *In re Carol B.,* 209 W.Va. 658, 550 S.E.2d 636 (2001) (recognizing that West Virginia Code § 49–2–14(e) provides for a "sibling preference" in placing children with foster or adoptive parents.). Thus, the birth of Joshua's half-siblings and his bond with them constitutes a substantial change in circumstance not anticipated in the original parenting order.[3]

■ Because two substantial changes have arisen since entry of the parenting plan order which were not provided for in that order, modification of the parenting plan is appropriate if it serves Joshua's best interests. *See* W. Va.Code § 48–9–401(a). The guardian ad litem in this case concluded that modifying the parenting plan order to increase Skidmore's parenting time with Joshua is in the child's best interest. Indeed, this is to be expected, as this Court has previously recognized that " '[t]he best interests of a child are served by preserving important relationships in that child's life.' Syl. pt. 2,

*State ex rel. Treadway v. McCoy,* 189 W.Va. 210, 429 S.E.2d 492 (1993)." Syl. Pt. 4, *State ex rel. Kutil v. Blake,* 223 W.Va. 711, 679 S.E.2d 310 (2009).[4]

Moreover, Joshua himself has expressed a clear preference to spend more time with his father. Given Joshua's age at the time that the petition was filed, and because the guardian ad litem found Joshua to be a mature child, his preferences should be considered in determining what is in his best interest.[5] Consequently, because Joshua's best interests will be served by modifying the parenting plan to increase the amount of parenting time allotted to Skidmore, the family and circuit courts erred in denying Skidmore's petition to modify the parenting plan order.

■ This Court further notes that the objectives set forth by the Legislature in West Virginia Code § 48–9–102(a), which courts are to consider in establishing custody arrangements, will be met by such a modification. Indeed, increasing Skidmore's parenting time will promote the objective of providing "[m]eaningful contact between a child and each parent." *Id.* at § 48–9–102(a)(4). Moreover, because all of the rele-

---

3. To be clear, neither the birth of a half-sibling nor the advance in a child's age will necessarily constitute a basis for a modification of a parenting plan order in all cases. Whether any change in circumstance that was not anticipated in a parenting plan can serve as the basis for a modification is a case specific question, and courts must consider the best interest of the child in each individual case.

4. In considering a child's best interest with regards to custody and visitation, this Court has recognized that

"these interests are interests of the child and not of the parent. Visitation is, to be sure, a benefit to the adult who is granted visitation rights with a child. But it is not the adult's benefit about which the courts are concerned. It is the benefit of the child that is vital." *Honaker v. Burnside,* 182 W.Va. 448, 452, 388 S.E.2d 322, 325 (1989) (*quoting Note, Visitation Beyond the Traditional Limitations,* 60 Ind.L.J. 191, 219 (1984)). Thus, "[v]isitation is not solely for the benefit of the adult visitor but is aimed at fulfilling what many conceive to be a vital, or at least a wholesome contribution to the child's emotional well being by permitting partial continuation of an earlier established close relationship." *Honaker,* 182 W.Va. at 452, 388 S.E.2d at 325 (*quoting Looper v. McManus,* 581 P.2d 487, 488 (Okla.Ct.App.1978)).

5. Because Joshua was only eleven years old when the petition to modify the parenting plan was filed, West Virginia Code § 48–9–402(b)(3), which provides for modification based on "the reasonable and firm preferences of a child who has attained the age of fourteen," did not apply. Nevertheless, Joshua's preferences should be considered in determining whether a modification based on a substantial change in circumstance is in his best interest. This Court has previously recognized that a child's preferences with regard to custody matters should be considered when that child's age and maturity level so warrants, even if the child has not yet reached the age of fourteen. *See State ex rel. Jeanne U. v. Canady,* 210 W.Va. 88, 96–97, 554 S.E.2d 121, 129–30 (2001) ("While Jordan is not yet fourteen years of age, his age and maturity level should be considered, and his desires concerning visitation with his biological father must be examined."). In this case, the guardian ad litem's report represents that Joshua is "bright," "articulate" and "mature for his age," and that he expressed a clear desire to spend more time with his father. Under these circumstances, Joshua's clearly expressed preference should be among the factors considered in determining whether a modification is in his best interest.

vant primary objectives are met by such a modification, it is appropriate for the family court to further consider the secondary objective of achieving fairness between the parties when implementing the new plan. *See id.* at § 48–9–102(b). As this Court has previously held, " '[i]n considering visitation issues, the courts must also be mindful of facilitating the right of the non-custodial parent to a full and fair chance to continue to have a close relationship with his children.' Syllabus point 9, *White v. Williamson,* 192 W.Va. 683, 453 S.E.2d 666 (1994)." Syl. Pt. 3, *Storrie v. Simmons,* 225 W.Va. 317, 693 S.E.2d 70 (2010).

For these reasons, this Court remands the case to the family court for modification of the parenting plan order. On remand, appropriate modification to the current parenting plan should be made to meaningfully increase the time that Joshua spends with his father and half-siblings.

**2.**

The lower courts also erred in their application of West Virginia Code § 48–9–401(b), by misinterpreting the term "manifestly harmful." West Virginia Code § 48–9–401(b) provides that "[i]n exceptional circumstances, a court may modify a parenting plan if it finds that the plan is not working as contemplated and in some specific way is manifestly harmful to the child, even if a substantial change of circumstances has not occurred." In this case, the family court found that, to establish that a parenting plan is "manifestly harmful," a petitioner must prove "something close to abuse and neglect." Thus, the family court interpreted the word "manifestly" as modifying the severity of the harm, and the circuit court affirmed that interpretation.

■■ The term "manifestly harmful" is not defined within the statute nor has this Court ever addressed its meaning. Once again, however, the term is without ambiguity and, thus, this Court will apply its plain meaning " 'without resorting to the rules of interpretation.' " *Williams,* 196 W.Va. 639, 474 S.E.2d 569, Syl. Pt. 1, in part (*quoting,* in part, Syl. Pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968)). The word "manifest" is defined as "readily perceived by the eye or the understanding; evident; obvious; appar-

ent; plain . . . ." *Random House Webster's Unabridged Dictionary* 1169 (2d ed.1998); *see also Merriam–Webster's Collegiate Dictionary* 755 (11th ed.2005) ("1: readily perceived by the senses and esp. by the sight 2: easily understood or recognized by the mind: OBVIOUS"). Thus, the term "manifestly harmful" as used in West Virginia Code § 48–9–401(b) (2009) means obviously harmful or plainly harmful. Contrary to the lower courts' interpretation, the term "manifestly" does not require any specific level of harm, but merely means that the harm is readily apparent.

The family and circuit courts, therefore, clearly erred in their interpretation of the term "manifestly harmful" as it is used in West Virginia Code § 48–9–401(b). Nevertheless, because this Court has already determined that a modification of the parenting plan order is warranted as the result of substantial changes in circumstance, this Court need not determine whether the instant case is one of those "exceptional circumstances" in which the current parenting plan order is "manifestly harmful" to the child involved. *See id.*

## B. Allocation of Health Insurance Responsibility

As a second issue, Skidmore argues that the family and circuit courts erred in denying his request to carry Joshua on his family health insurance policy. Skidmore contends that permitting him to include Joshua on his policy will save Rogers approximately $350.00 a month, which is Rogers's cost of insuring Joshua on her policy. Skidmore would also benefit, because without this health insurance expense, Rogers would not have been entitled to an increase in child support, thereby saving Skidmore approximately $130.00 a month, the amount of the increase to Skidmore's child support order.

West Virginia Code § 48–12–102 (2009) provides that, in any action establishing or modifying child support, courts must consider the ability of the parents to provide medical care for the children. To that end, "[t]he court shall determine whether appropriate medical insurance coverage as defined in section one hundred one [§ 48–12–101] of this

article is available to either parent. If such insurance coverage exists, the court shall order the appropriate parent to enroll the child in that coverage...." *Id.* at § 48–12–102(1). "Appropriate health insurance coverage" is defined as "insurance coverage that is reasonable in cost, comprehensive in nature and reasonably accessible to the child to be covered." W. Va.Code § 48–12–101(1) (2009). " 'Reasonable costs' means the child's portion of the medical insurance premiums not exceeding five percent of the gross income of the parent who provides the coverage." *Id.* at § 48–12–101(12).

Skidmore argues that Rogers is spending 8.9% of her monthly gross income to insure Joshua. He contends that the additional cost to him to insure Joshua would be zero percent of his monthly gross income. Accordingly, he contends that he can offer "appropriate health insurance coverage" which is "reasonable in cost," while Rogers cannot because her coverage is not a "reasonable cost," as it exceeds five percent of her monthly gross income. Skidmore therefore contends that he is the appropriate parent to carry health insurance for Joshua, and that the lower courts abused their discretion by refusing to allow him to carry Joshua on his plan.

■ Skidmore first raised this issue orally during a family court hearing regarding Rogers's petition for expedited modification of child support. Although Skidmore apparently provided supporting documentation to the circuit court when the issue was eventually appealed,[6] he did not present any documentation to support his request when he initially raised the issue before the family court. Rogers, who was representing herself and who had no notice of Skidmore's intent to raise this issue prior to the hearing, objected to the motion on the basis that she did not want any change that would require her

to speak more frequently with Skidmore. Without explaining its reasoning, other than to acknowledge the contentious history of the parties' divorce, the family court rejected Skidmore's proposal.

If Skidmore can, in fact, add Joshua to his health insurance policy with little or no additional cost, allowing him to do so would not only be economical for both parties, it would also comply with framework set forth in West Virginia Code § 48–12–102. Nevertheless, because Skidmore did not present any documentation to support his request when he raised this issue, and because Rogers had no notice that this issue would be raised and no opportunity to prepare a response, the family court did not abuse its discretion in denying the request at the March 18, 2009, hearing, nor did the circuit court err in affirming that decision. The family court, however, will necessarily have to modify the current child support order in light of the changes it will make to the parenting plan on remand. At that time, assuming that appropriate documentation is provided and that Rogers is afforded an opportunity to respond, the family court should reconsider this issue in light of the directives set forth in West Virginia Code § 48–12–102.[7]

### C. Retroactive Modification of Child Support

In her cross-assignment of error, Rogers contends that the family court erred in refusing to retroactively apply its order increasing child support. As already explained, Rogers first requested an increase in child support on March 31, 2008, in her response brief to Skidmore's petition for a modification of the parenting plan. The family court denied that request, finding that Rogers had failed to file a petition for modification, the respective filing fee, a financial statement, or even allege a substantial change in the support award of fifteen percent or more, as required by West

---

**6.** The record does not contain any supporting documentation that Skidmore may have provided to the circuit court. In her brief to this Court, however, Rogers indicates that Skidmore provided "figures, cost quotations and comparative cost analysis" to the circuit court in his appeal.

**7.** Although the family court's ruling on this issue is affirmed, the Court notes that the reason given by Rogers for opposing Skidmore's request, i.e.

that she did not want to have to speak with Skidmore more often, is not a reasonable basis for denying that request. While the parties clearly have a long and contentious history, each must set aside his or her personal dislike for the other, to act in accordance with their child's best interests and in compliance with the relevant statutory objectives.

Virginia Code § 48–11–105(b). Rogers then filed a petition for expedited modification of child support pursuant to West Virginia Code § 48–11–106 on January 16, 2009, but requested that the award be made retroactive to her original March 31, 2008, request.

This Court has held that modifications of child support orders cannot, in general, be made retroactive. In syllabus point two of *Hayhurst v. Shepard*, 219 W.Va. 327, 633 S.E.2d 272 (2006), this Court stated:

> The authority of a family court to modify a spousal support or child support award is prospective only and, absent a showing of fraud or other judicially cognizable circumstance in procuring the original award, a family court is without authority to modify or cancel accrued alimony or child support installments.

(Emphasis added); *see also Skidmore v. Skidmore*, 225 W.Va. 235, 691 S.E.2d 830 (2010) (holding that the family court erred by retroactively modifying a child support order, despite a parent's failure to disclose an increase in income). Rule 23 of the West Virginia Rules of Practice and Procedure for Family Court similarly provides that "[e]xcept for good cause shown, orders granting relief in the form of spousal support or child support *shall make such relief retroactive to the date of service of the motion for relief.*" (Emphasis added). Thus, as a general rule, family courts are authorized only to make prospective awards of child support, which, under Rule 23, may be retroactive only to the date the petition for modification is served on the opposing party.

A party seeking an expedited modification of child support must file such request in accordance with the guidelines set forth by statute. West Virginia Code § 48–11–106(b) (2009) provides that:

> [t]he party seeking the recalculation of support and modification of the support order shall file a description of the decrease or increase in income and an explanation of the cause of the decrease or increase *on a standardized form* to be provided by the secretary-clerk or other employee of the family court. The standardized form shall be verified by the filing party. Any available documentary evidence shall be filed with the standardized form.

(Emphasis added). Thus, to obtain expedited modification of her child support order, Rogers was required to file a standardized form with supporting documentation. Rogers, however, did not file the standardized form and supporting documentation when she originally requested modification in March 2008. Rather, she first filed the correct form and documents on January 16, 2009, when she filed her "Petition for Expedited Modification of Child Support." This petition was served on Skidmore on February 3, 2009. Thus, pursuant to Rule 23 of the West Virginia Rules of Practice and Procedures of Family Court, the date to which the increase in child support could have been made retroactive is February 3, 2009, the date on which that petition was served on Skidmore. The family court, therefore, did not err in refusing to make the award of child support retroactive to March 2008; indeed, it would have had no authority to so rule.

## IV. CONCLUSION

For the reasons stated herein, this Court reverses the June 23, 2009, order of the Circuit Court of Braxton County, West Virginia, denying Skidmore's petition to modify the parenting plan, and remands the case to the family court for modification of the parenting plan in a manner that is consistent with this opinion. The Court affirms, however, the circuit court's July 2, 2009, order, which affirmed the family court's modification of the child support order.

Affirmed, in part, reversed, in part, and remanded with directions.