IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 18-0987
_____

FILED
March 26, 2020
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STACEY J.,
Petitioner

v.

HENRY A.,
Respondent

_____

Appeal from the Circuit Court of Mercer County
Honorable Derek C. Swope, Judge
Civil Action No. 16-D-508

REVERSED AND REMANDED WITH DIRECTIONS
_____

Submitted: January 14, 2020
Filed: March 26, 2020

Paige Flanigan, Esq.                          Debra Kilgore, Esq.
Flanigan Law Office                           Burton & Kilgore, PLLC
Princeton, West Virginia                      Princeton, West Virginia
Attorney for Petitioner                       Attorney for Respondent

Joshua J. Miller, Esq.
Joshua J. Miller, Attorney at Law, PLLC
Beckley, West Virginia
Guardian ad Litem

JUSTICE HUTCHISON delivered the Opinion of the Court.
JUSTICE WALKER dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syl., *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

2. "Pursuant to West Virginia Code § 48-9-403(d)(1) (LexisNexis 2015), if a parent who is exercising a significant majority of the custodial responsibility for a child proves that a proposed relocation is in good faith for a legitimate purpose, the location of the proposed move will be presumed to be reasonable. To overcome this presumption, the opposing parent must prove that the purpose of the move is substantially achievable without moving or by moving to a location that is substantially less disruptive of the opposing parent's relationship to the child." Syl. Pt. 3, *Nicole L. v. Steven W.*, 241 W.Va. 466, 825 S.E.2d 794 (2019).

3. "'"In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In re Kaitlyn P.*, 225 W.Va. 123, 690 S.E.2d 131 (2010).

4. "To justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." Syl. Pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977).

5. "For purposes of the parental relocation statute, West Virginia Code § 48-9-1 *et seq.*, 'custodial responsibility' includes duties innate to parenthood such as those defined as caretaking functions in West Virginia Code § 48-1-210 (LexisNexis 2015)." Syl. Pt. 2, *Nicole L. v. Steven W.*, 241 W.Va. 466, 825 S.E.2d 794 (2019).

**HUTCHISON, Justice:**

The petitioner, Stacey J.[1] ("Mother"), appeals the October 1, 2018, order of the Circuit Court of Mercer County affirming an order of the Family Court of Mercer County entered on August 9, 2018, that denied her motion to relocate to Myrtle Beach, South Carolina, with her two children. By that order, the family court also designated the children's father, the respondent herein, Henry A. ("Father"), as their primary residential parent; terminated his child support obligation; and imposed a monthly child support obligation upon Mother in the amount of $612.96. In this appeal, Mother contends that the family court erred by failing to conduct a proper analysis of the children's best interests and by applying the wrong legal standards to her motion to relocate. Upon consideration of the parties' briefs, oral arguments, record on appeal, and pertinent authorities, we reverse the final order and remand this case for further proceedings consistent with this opinion.

## I. Facts and Procedural Background

The parties were married on December 24, 2008, and were divorced by a final order entered on January 31, 2017. During their marriage, they had two children, a son born in 2010 and a daughter born in 2012. At the time of their divorce, the parties

---

[1] In cases involving minor children and sensitive facts, we use initials to identify the parties rather than their full names. *See* W.Va. R. App. Proc. 40(e); *see also State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

1

agreed to joint legal custody and purportedly had an equal split of time with the children as both were living in Mercer County.

In August 2017, Mother filed a motion to modify the custodial arrangement alleging that as a result of Father's work schedule, he had less time to spend with the children. The family court declined to modify the custodial arrangement at that time because Father reported that he was no longer working the night shift and had more time to care for the children. In May 2018, Mother filed another motion to modify the parenting plan because Father's work schedule changed to the night shift again. She alleged that the children feared visiting their paternal grandparents' home where they had to stay while they were in Father's custody and he was working. Before a hearing could be held on that motion, Mother's employment was terminated, and she filed a notice of relocation. Mother indicated that she was moving to Myrtle Beach, South Carolina, to begin new employment on July 9, 2018. She sought to modify the custodial arrangement to relocate the children to her new residence in Myrtle Beach.

The family court held hearings in July 2018 regarding the Mother's motions for modification.[2] At the first hearing, Mother, who had been employed as a certified CT

---

[2] Mother's second motion to modify custody appears to have resulted, in part, from referrals made to Child Protective Services ("CPS"). The first referral, made in October 2017, alleged that the paternal grandfather had grabbed the younger child's arm. The record does not disclose the source of the referral, but it does not appear to have been Mother. The CPS investigation revealed that the grandfather grabbed the child to prevent

2

technician, testified that her employment was terminated because she had injected the wrong patient with dye. At a subsequent hearing, she testified again and admitted that another reason she was fired from her job was because she "inappropriately accessed" the medical records of her current husband's ex-wife and child numerous times.[3] Mother also testified that she could not find work within her field in West Virginia; that she did not wish to pursue employment opportunities that would result in less pay; and that she could not accept a different position such as an x-ray technician or mammography technician without additional training. Consequently, after her job search, the only employment offers she received for the position of CT technician were in Myrtle Beach, South Carolina, and

---

her from running into the street and oncoming traffic. Thus, the allegation of abuse was not substantiated. A second referral from an anonymous source was made to CPS in April 2018 concerning allegations that Father and paternal grandfather had inappropriate pictures of the youngest child on their cell phones. Mother reported at that time that the children had been "hit" while at Father's house and her daughter had bruises. A CPS worker urged Mother to obtain a Domestic Violence Protective ("DVP") order against Father and grandfather because of these allegations. She did so but later dismissed the DVP against Father when the allegations were not substantiated. During interviews with the children at this time, the older child expressed a fear of his grandfather because he had chased the children with a "taser." Based on testimony from the hearings below, it appears that CPS concluded that the grandfather was playing a game and only teasing the children. Also, in July 2018, the children called Mother and reported that they had been left at their Father's home with his girlfriend; that she was asleep and they were unable to wake her; that they were hungry and had nothing to eat; and that the girlfriend's child was locked in his room. The mother called her attorney who called the guardian ad litem who then made a report to CPS. Upon investigation, it was discovered that the call was made early in the morning; that the girlfriend had not yet awoken when the call was made by the children; that the girlfriend's son is autistic; and that an appropriate lock mechanism was being used on his bedroom door to prevent him from wandering at night. Thus, no abuse and neglect allegations were substantiated. While the family court heard testimony from CPS workers who investigated these allegations, the ultimate focus of the hearings in July 2018 was whether Mother should be permitted to relocate the children to South Carolina.

[3] It appears that the Mother remarried soon after her divorce from Henry A.

Savannah, Georgia. Mother testified that she accepted the position in Myrtle Beach, in part, because her parents reside just two hours away in Santee, South Carolina, and are available to help with the children when needed.

Following the hearings, the family court entered its order denying Mother's motion to relocate the children to Myrtle Beach, designating Father as the primary residential parent, and adjusting child support obligations accordingly.[4] In denying the motion to relocate, the family court first found that West Virginia Code § 48-9-403 (2001), which governs parent relocation,

> requires a parent to have a percentage of custodial responsibility constituting a significant majority of time which is 70% or more. Both parents were exercising 50% of the time with the children and had been doing so for some time.

The family court then found that Mother's reason for relocating to South Carolina was not legitimate. In that regard, the family court stated:

> The Court has no doubt that the mother needs to seek alternative employment due to her intentional and negligent conduct which cost her the gainful employment she had enjoyed for over 10 years. The Court believes that her credibility has been called into serious question by her misrepresentation to the court about 1) the basis of her termination of employment; and, 2) her misrepresentation to the court about her being pregnant at the final divorce hearing in this action. The Court also believes that her intentional actions and ethical violations call into question the legitimacy

---

[4] By the time the family court's order was entered, Mother had moved to Myrtle Beach with her current husband, Dale J., and their child. The parties' children stayed in West Virginia with Father, as Mother did not object to the children spending the remainder of the summer with him pending the court's decision on her motion to relocate.

4

of this relocation. Although fault is not specifically set forth in the relocation analysis, the Court believes it goes to the heart of the legitimacy and good faith of the Petitioner's claim.

. . . .

The Court does not believe that this relocation is legitimate and reasonable in that there were several other jobs available closer to the children's home which would be substantially less disruptive of the father's relationship to the children.

Finally, the family court found that it was in the children's best interests to primarily reside in West Virginia with Father because he would "not actively seek to disparage or diminish the children's time with [Mother]." Upon entry of the family court's August 9, 2018, order, Mother filed an appeal with the circuit court. Thereafter, the circuit court held a hearing and allowed the parties to present oral arguments. By order dated October 1, 2018, the circuit court denied Mother's appeal and affirmed the family court's order. This appeal followed.

## II. Standard of Review

Our standard of review is well established. The syllabus of *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004), provides:

In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

With this standard in mind, we consider the parties' arguments.

5

## III. Discussion

In this appeal, Mother primarily contends that the family court failed to conduct a proper analysis of the children's best interests for purposes of determining where they should reside following her relocation. Under West Virginia Code § 48-9-403(c), when a parent seeks to relocate, "the court shall, if practical, revise the parenting plan so as to both accommodate the relocation and maintain the same proportion of custodial responsibility being exercised by each of the parents." When it is not "practical" to maintain the same proportion of custodial responsibility, West Virginia Code § 48-9-403(d) directs that

> the court shall modify the parenting plan in accordance with the child's best interests and in accordance with the following principles:
>
> (1) A parent who has been exercising a significant majority of the custodial responsibility for the child should be allowed to relocate with the child so long as that parent shows that the relocation is in good faith for a legitimate purpose and to a location that is reasonable in light of the purpose. The percentage of custodial responsibility that constitutes a significant majority of custodial responsibility is seventy percent or more. A relocation is for a legitimate purpose if it is to be close to significant family or other support networks, for significant health reasons, to protect the safety of the child or another member of the child's household from significant risk of harm, to pursue a significant employment or educational opportunity or to be with one's spouse who is established, or who is pursuing a significant employment or educational opportunity, in another location. The relocating parent has the burden of proving of the legitimacy of any other purpose. A move with a legitimate purpose is reasonable unless its purpose is shown to be substantially achievable without moving or by moving to a location that is substantially less disruptive of the other parent's relationship to the child.

6

(2) If a relocation of the parent is in good faith for legitimate purpose and to a location that is reasonable in light of the purpose and if neither has been exercising a significant majority of custodial responsibility for the child, the court shall reallocate custodial responsibility based on the best interest of the child, taking into account all relevant factors including the effects of the relocation on the child.

(3) If a parent does not establish that the purpose for that parent's relocation is in good faith for a legitimate purpose into a location that is reasonable in light of the purpose, the court may modify the parenting plan in accordance with the child's best interests and the effects of the relocation on the child. Among the modifications the court may consider is a reallocation of primary custodial responsibility, effective if and when the relocation occurs, but such a reallocation shall not be ordered if the relocating parent demonstrates that the child's best interests would be served by the relocation.

(4) The court shall attempt to minimize impairment to a parent-child relationship caused by a parent's relocation through alternative arrangements for the exercise of custodial responsibility appropriate to the parents' resources and circumstances and the developmental level of the child.

In *Storrie v. Simmons*, 225 W.Va. 317, 325, 693 S.E.2d 70, 78 (2010), our seminal case on parent relocation, we observed that "when the factors set forth in subsection (1) [of W. Va. Code § 48-9-403(d)] are met, the Court *should* allow the parent who has been exercising the significant majority of custodial responsibility to relocate with the children, and *shall* modify the parenting plan accordingly, in a manner that is in the children's best interests." (Emphasis in original). More recently, we made clear that

[p]ursuant to West Virginia Code § 48-9-403(d)(1) (LexisNexis 2015), if a parent who is exercising a significant majority of the custodial responsibility for a child proves that a proposed relocation is in good faith for a legitimate purpose, the location of the proposed move will be presumed to be

7

reasonable. To overcome this presumption, the opposing parent must prove that the purpose of the move is substantially achievable without moving or by moving to a location that is substantially less disruptive of the opposing parent's relationship to the child.

Syl. Pt. 3, *Nicole L. v. Steven W.*, 241 W.Va. 468, 475, 825 S.E.2d 794, 796 (2019). Under subsections (2) and (3) of West Virginia Code § 48-9-403(d) "where neither parent has been exercising a majority of custodial responsibility, or where the parent seeking to relocate is not doing so for a legitimate purpose, the court must modify the parenting plan according to the child's best interest." *Storrie*, 225 W.Va. at 323, 693 S.E.2d at 76. Thus, regardless of which subsection of West Virginia Code § 48-9-403(d) applies, the parenting plan must be modified in accordance with the child's best interests. The child's best interests must always be considered because

> "'in a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972)." Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995).

Syl. Pt. 2, *In re Kaitlyn P.*, 225 W.Va. 123, 690 S.E.2d 131 (2010). Therefore, "[t]o justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." Syl. Pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977).

Mother contends that the family court's analysis of the best interests of the children was insufficient because no consideration was given to the evidence provided by

the guardian ad litem ("GAL") regarding the children's close emotional bond with her and their clearly expressed desire to live with her, their half-brother, and stepfather. Mother asserts that the family court erred by focusing upon her misconduct that caused her employment to be terminated and the abuse allegations she made against Father and paternal grandfather when she obtained the DVP, noting that she only sought a DVP because it was suggested by CPS. She maintains that the family court erred by concluding that it was in the children's best interests to reside with Father solely because the court believed that between the two of them, Father would be more likely to facilitate the children's relationship and visitation with the other parent.

Upon review, we find merit to Mother's argument as the family court's order contains only one brief paragraph regarding the children's best interests. Specifically, the family court order states:

> Ultimately, the Court should decide what is in the best interest of the children. The Court finds that it is in the best interest of the child [sic] to live with a parent who will not actively seek to disparage or diminish the children's time with the other parent. In this case the Court finds the children's best interest will be served by designating the father as primary residential parent and attempting to maximize non-school time with the mother.

While facilitating meaningful contact between a parent and child is a factor to be considered, it is not the only relevant consideration in an analysis of a child's best interests for purposes of determining custodial allocation following a parent's relocation.

9

In *Storrie*, this Court observed that West Virginia Code § 48-9-102 (2001) sets forth multiple factors to consider when making a decision that serves a child's best interests. *Id.* at 327, 693 S.E.2d at 80. Specifically, the statute provides that a child's best interests are served by facilitating:

(1) Stability of the child;

(2) Parental planning and agreement about the child's custodial arrangements and upbringing;

(3) Continuity of existing parent-child attachments;

(4) Meaningful contact between a child and each parent;

(5) Caretaking relationships by adults who love the child, know how to provide for the child's needs, and who place a high priority on doing so;

(6) Security from exposure to physical or emotional harm; and

(7) Expeditious, predictable decision-making and avoidance of prolonged uncertainty respecting arrangements for the child's care and control.

*Id.* The family court's order gives no indication that these factors were considered. Rather, in support of the decision, the family court order only references West Virginia Code § 48-9-209 (2016), which sets forth factors that limit and, in some instances, preclude a parent's custodial time.[5] Yet, the family court expressly acknowledged it "[could] not make a

---

[5] West Virginia Code § 48-9-209(a) provides:

If either of the parents so requests, or upon receipt of credible information thereof, the court shall determine whether a parent who would otherwise be allocated responsibility under a parenting plan:

10

finding today that [Mother] is guilty of parental alienation beyond a preponderance of the evidence." Nonetheless, the family court proceeded to conclude that it was in the children's best interests to primarily reside with their Father because he would be "the parent who is more likely to support a consistent relationship with the other parent." Upon review, we find that not only did the family court erroneously rely upon a single factor in its analysis of the children's best interests, its conclusion as to that factor is not supported by the record.

The record shows that prior to the July 2018 hearings, the GAL submitted a written report to the family court recommending that the children be allowed to relocate to

---

(1) Has abused, neglected or abandoned a child, as defined by state law;

(2) Has sexually assaulted or sexually abused a child as those terms are defined in articles eight-b and eight-d, chapter sixty-one of this code;

(3) Has committed domestic violence, as defined in section 27-202;

(4) Has interfered persistently with the other parent's access to the child, except in the case of actions taken for the purpose of protecting the safety of the child or the interfering parent or another family member, pending adjudication of the facts underlying that belief; or

(5) Has made one or more fraudulent reports of domestic violence or child abuse: Provided, That a person's withdrawal of or failure to pursue a report of domestic violence or child support shall not alone be sufficient to consider that report fraudulent.

Subsection (b) of the statute sets forth a list of limitations that may be imposed if a parent is found to have engaged in any activity specified in subsection (a).

11

South Carolina with Mother. In addition, the GAL testified at the final hearing on the matter and explained why he had concluded that the relocation was in the children's best interests. He testified:

> I've seen them at their mother's house, at their father's house, so I – I just set back and observed . . . and then I've just talked to the kids later.
>
> But you know, they have a really close bond with their mother. They have a really close bond with their baby brother. That's why in my report, I recommend that you allow this relocation if you felt that it was in good faith and that would be cause I know nothing about that if she applied or didn't apply for jobs, but it was in good faith. You know, she's telling you that she's – she will give the father the entire summer, every other weekend, all the [school] breaks. That to me didn't feel like someone that was trying to alienate the children from their father. That was the reason for my recommendation.

While the GAL further testified that he was now a "little hesitant" because he did not know when he submitted his written recommendation that Mother had lost her job because she wrongfully accessed medical records, he nonetheless concluded his testimony by recommending that the children be allowed to relocate with Mother and Father be given as much visitation as possible.

Notably, the GAL also testified that the relationship between Mother and Father was "pretty good"; that they "did not say nasty things about each other" to him; and that they did a "good job" of communicating about the children via text messaging. When questioned by Mother's counsel about the abuse allegations against Father, the GAL testified:

Ms. Flanigan: One of the initial allegations in the DVP issued was, as I recall, an allegation that [Father] was taking inappropriate pictures of [daughter]?

Mr. Miller: Yes.

Ms. Flanigan: And you asked my client [Mother] about that, correct?

Mr. Miller: I did, yes.

Ms. Flanigan: And what did she tell you?

Mr. Miller: That she thought that was absurd, that she didn't think that was going on and she was shocked when she received that call.

Ms. Flanigan: Okay, and so and she was consistent in telling you that from the get go? She was defending Henry, correct?

Mr. Miller: Yes, she did.

Ms. Flanigan: Okay. Have there been other times other than today and you started seeing – seeing the two of them interact where they seemed to interact okay?

Mr. Miller: Yeah. Yes, I have reviewed messages between them, between the two. I mean, even when you talk to them, they – it's not the bashing thing you're used to seeing between parents that are involved in this type of case.

Ms. Flanigan: You were here when my client testified that Henry's a good dad?

Mr. Miller: Yes.

Ms. Flanigan: And, I don't recall anything – I don't recall [Henry] saying she is a bad mom?

Mr. Miller: No, he hasn't. I think he's a little frustrated, understandably.

13

Even though the GAL's testimony appears to contradict the family court's finding that Mother would not facilitate the children's relationship with Father, the family court made no findings of fact in its order to explain why the testimony was discounted. In fact, the GAL's testimony was completely ignored in the family court's analysis of the children's best interests.[6] Moreover, the record also shows that the family court refused to allow the GAL to give testimony regarding the children's custodial preferences. When Mother's counsel questioned the GAL about whether the children had indicated where they wanted to live, the family court refused to allow him to answer the question or provide any testimony on the issue, declaring "they're not of age to state a preference." However,

> [t]his Court has previously recognized that a child's preferences with regard to custody matters should be considered when that child's age and maturity level so warrants, even if the child has not yet reached the age of fourteen. *See State ex rel. Jeanne U. v. Canady*, 210 W.Va. 88, 96–97, 554 S.E.2d 121, 129–30 (2001) ( "While [the child] is not yet fourteen years of age, his age and maturity level should be considered, and his desires concerning visitation with his biological father must be examined.").

*Skidmore v. Rodgers*, 229 W.Va. 13, 22 n.5, 725 S.E.2d 182, 191 n.5 (2011); *see also* W.Va. Code § 48-9-206(a)(2) (2018) (providing for allocation of custodial responsibility "to accommodate, if the court determines it is the best interests of the child, the firm and reasonable preferences of a child who is fourteen years of age or older, and *with regard to a child under fourteen years of age, but sufficiently matured that he or she can intelligently*

---

[6] While the order does summarize the GAL's written recommendation, it is not mentioned in the family court's analysis of the children's best interests.

14

*express a voluntary preference for one parent, to give that preference such weight as circumstances warrant"*) (emphasis added). In this instance, the family court refused to even permit the GAL to testify about whether the children's maturity levels warranted consideration of their preferences.

Given all the above, we find that the family court's order contains insufficient findings of facts and conclusions of law to support its determination that it is in the children's best interests to primarily reside with Father. The family court failed to perform an adequate analysis because it did not consider all the relevant factors for determining whether the reallocation of custody would serve the children's best interests. Consequently, we must reverse the final order and remand this case for a proper and thorough analysis in that regard. In doing so, we wish to make clear that we do not condone any of the misconduct on the part of Mother. Indeed, the Mother's failure to be completely forthright with the family court regarding the reason she was terminated from her employment is inexcusable. However, it is the best interests of the children that must guide the decision of the court. To that end, all relevant factors must be considered, and the family court must make adequate findings of fact and conclusions of law to support its decision and to allow for meaningful appellate review.

Mother also argues in this appeal that the family court erred by initially concluding that she could not relocate with the children because she did not have custodial responsibility of the children at least seventy percent of the time. Rejecting this argument,

15

the circuit court found the family court's statement regarding custodial time exercised by Mother to be "slightly misguided" but not "fatal" because the family court merely considered it to be a factor in determining which subsection of West Virginia Code § 48-9-403(d) to apply, rather than the threshold determination.

Upon review, we agree with the circuit court's assessment of the family court's statement inasmuch as the Mother's motion to relocate was clearly not denied solely because of the amount of custodial responsibility she had at the time she decided to relocate. Nonetheless, we find that the family court should have undertaken an assessment of the custodial responsibility each parent was exercising to determine which statutory principle to apply under West Virginia Code § 48-9-403(d). While the parties purported to have an equal amount of custodial responsibility because they were exercising 50/50 split physical custody under their parenting plan, this Court recently observed that "custodial responsibility consists of much more than merely providing a shelter for overnight visits." *Nicole L.*, 241 W.Va. at 473, 825 S.E.2d at 801.

In *Nicole L.*, we recognized that "clarified guidance [wa]s needed as to the determination of custodial responsibility for the purposes of W.Va. Code § 48-9-403" because "[i]n its current form, the parental relocation statute provides limited guidance[.]" *Id.* Indeed, "other than stating that seventy percent constitutes a significant majority, the Legislature has never defined the criteria [to be] examined when calculating significant

16

responsibility." *Id.* We ultimately determined in *Nicole L.* that "custodial responsibility"

encompasses the essential functions of parenthood." *Id.* Accordingly, we held:

> For purposes of the parental relocation statute, West Virginia Code § 48-9-1 et seq., "custodial responsibility" includes duties innate to parenthood such as those defined as caretaking functions in West Virginia Code § 48-1-210 (LexisNexis 2015).[7]

---

[7] West Virginia Code § 48-1-210 provides that caretaking functions include:

> (1) Performing functions that meet the daily physical needs of the child. These functions include, but are not limited to, the following:
> (A) Feeding;
> (B) Dressing;
> (C) Bedtime and wake-up routines;
> (D) Caring for the child when sick or hurt;
> (E) Bathing and grooming;
> (F) Recreation and play;
> (G) Physical safety; and
> (H) Transportation.
> (2) Direction of the child's various developmental needs, including the acquisition of motor and language skills, toilet training, self-confidence and maturation;
> (3) Discipline, instruction in manners, assignment and supervision of chores and other tasks that attend to the child's needs for behavioral control and self-restraint;
> (4) Arrangements for the child's education, including remedial or special services appropriate to the child's needs and interests, communication with teachers and counselors and supervision of homework;
> (5) The development and maintenance of appropriate interpersonal relationships with peers, siblings and adults;
> (6) Arrangements for health care, which includes making medical appointments, communicating with health care providers and providing medical follow-up and home health care;
> (7) Moral guidance; and
> (8) Arrangement of alternative care by a family member, baby-sitter or other child care provider or facility, including

17

*Nicole L.*, 241 W.Va. at 467, 825 S.E.2d at 795, syl. pt. 2 (footnote added).

In *Nicole L.*, it was evident that the mother was exercising a significant majority of the custodial responsibility for both of her children because the record included evidence that the mother was primarily responsible for the children's education, transportation, medical visits, extracurricular activities, and daily care. *Id.* at 473-74, 825 S.E.2d at 801-02. Because no examination of caretaking functions was undertaken in this case, upon remand, the family court should consider evidence of the caretaking functions performed by the parties, holding a hearing on the issue if necessary, to calculate the proportion of each parent's custodial responsibility for purposes of determining which provision of West Virginia Code § 48-9-403(d) applies to Mother's motion to relocate.[8]

Finally, Mother argues that the family court erred by finding that her decision to relocate was not in good faith and for a legitimate purpose because her employment was terminated as result of her own misconduct. She argues that fault is not a factor to be considered under West Virginia Code § 48-9-403, and, therefore, by considering her

_____

investigation of alternatives, communication with providers and supervision.

[8] We recognize that the family court did not have the benefit of *Nicole L.* when this matter was presented for decision. However, because the amount of custodial responsibility a parent is exercising is the threshold determination that dictates which subsection of West Virginia Code § 48-9-403(d) applies to a parent's motion to relocate, an examination of caretaking functions is warranted.

18

conduct, the family court misapplied the statute. We find no merit to this argument as the family court ultimately concluded that Mother's relocation was not legitimate and reasonable because "there were several other jobs available closer to the children's home which would be substantially less disruptive of the father's relationship to the children." While the family court may have disregarded Mother's testimony concerning her efforts to find other employment closer to Father's home based on its assessment of her credibility, such decision was a proper exercise of the court's discretion. *See Mulugeta v. Misailidis*, 239 W.Va. 404, 408-09, 801 S.E.2d 282, 286-87 (2017) ("It is within the sole province of the family court, as fact-finder, to decide issues of credibility, and this Court will not disturb those determinations. Even where testimony is uncontroverted, a fact-finder is free to disregard such testimony if it finds the evidence self-serving, and not credible." (Footnote omitted)).

Accordingly, for the reasons set forth above, we reverse the final order and remand this case to the circuit court with instructions to remand to the family court. The family court should reconsider Mother's motion to modify custody based upon her relocation and make adequate findings of facts and conclusions of law regarding the children's best interests taking into consideration all relevant factors as outlined above. In doing so, the family court should first undertake an assessment of the caretaking functions being exercised by each parent before Mother filed her motion to relocate to calculate custodial responsibility for purposes of determining which provision of West Virginia Code § 48-9-403(d) applies in this instance. Our findings today with respect to the family

court's order should not be construed as an indication that Mother's motion to relocate should be granted. In the absence of a complete and thorough analysis of the factors relevant to determining the children's best interests, the merits of the parties' arguments cannot be determined at this juncture.

## IV. Conclusion

The final order entered on October 1, 2018, is reversed, and this case is remanded to the Circuit Court of Mercer County with directions to remand to the Family Court of Mercer County for further proceedings consistent with this opinion.

Reversed and remanded with directions.